2004 SD 110

Donald E. MOELLER, Petitioner and Appellant,

v.

Douglas L. WEBER, Warden, South Dakota State Penitentiary, Respondent and Appellee.

No. 22510.

Supreme Court of South Dakota.

Argued on March 22, 2004.

Decided Oct. 6, 2004.

Mark F. Marshall of Davenport, Evans, Hurwitz & Smith, Sioux Falls, for appellant.

Lawrence E. Long, Attorney General, Grant Gormley, Assistant Attorney General, Craig M. Eichstadt, Robert Mayer, Deputy Attorneys General, Gary Campbell, Sherri Sundem Wald, Assistant Attorneys General, Pierre, for appellee.

KONENKAMP, Justice.

[¶ 1.] Petitioner, Donald Moeller, was tried, convicted, and sentenced to death for the rape and murder of a nine-year-old girl. He applied for a writ of habeas corpus in the circuit court. We affirm the circuit court's denial of relief.

### Background

[¶ 2.] On May 8, 1990, nine-year-old Becky O'Connell was abducted after she visited a local store in Sioux Falls. Moeller had also been a customer there. After Becky left the store, a witness saw her presumably heading home. The witness also testified that he noticed Moeller moving toward Becky and Becky shying away

from him. Becky never made it home. Shortly after the witness had seen Becky and Moeller, three men driving through a secluded tract south of Sioux Falls noticed a light blue pickup with South Dakota license plates leaving the area. They later described the driver of the vehicle as matching Moeller's general description.

[¶ 3.] The next day, two men discovered Becky's body south of Sioux Falls in the area the blue pickup had been seen. An autopsy revealed that Becky had been sexually assaulted and stabbed to death. Three days later, as part of the murder investigation, a police detective spoke with Moeller about Becky's disappearance. Moeller admitted owning a blue pickup truck. He denied any involvement with the disappearance and provided the detective with blood and hair samples. The following day, Moeller fled South Dakota. He left behind his ill mother and his truck. While in the State of Washington, he used at least two aliases.

[¶ 4.] On Moeller's disappearance, the police obtained a search warrant for his home. Under his bed, they discovered a section of the Sioux Falls Argus Leader containing a composite sketch of Becky's murderer and an article discussing the crime. Moeller's clothes, which would have been subject to soil analysis, were found freshly washed in his otherwise messy, filthy room.

[¶ 5.] Moeller was eventually apprehended and returned to South Dakota. On July 31, 1991, he was indicted by a Lincoln County Grand Jury on one count of first degree rape, one count of felony murder, and one count of first degree murder. The State filed a death penalty notice alleging four aggravating circumstances.

[¶ 6.] Moeller's first trial began in July 1992. On September 1, 1992, the jury returned a verdict of guilty of one count of rape in the first degree, and one count of premeditated murder in the first degree. After a presentence hearing, the jury imposed the death sentence.

[¶ 7.] The conviction was reversed on appeal and remanded for a new trial. *State v. Moeller*, 1996 SD 60, 548 N.W.2d 465 (*Moeller I*). The same attorneys who represented Moeller in the first trial represented him in the second trial. In the second trial, the State presented testimony that Moeller had visited the entrance to the secluded crime scene two days before Becky's rape and murder. The State offered expert evidence that soil samples taken from Moeller's vehicle and the crime scene were similar. Also DNA evidence was offered relating to semen taken from Becky's body that demonstrated that the probability of a person in the Caucasian population having DNA characteristics common to Moeller's would be 1 in 130 million if the APO–B DNA analysis was not included and a 1 in 14.8 billion probability if the APO–B DNA analysis was included.

[¶ 8.] The jury convicted Moeller of rape in the first degree and murder in the first degree. After a presentencing hearing, the jury found three aggravating circumstances and imposed the death sentence. On direct appeal, we affirmed. *State v. Moeller*, 2000 SD 122, 616 N.W.2d 424 (*Moeller II*).

[¶ 9.] On February 16, 2001, Moeller filed an application for habeas corpus. The matter was heard by Circuit Judge Gene Paul Kean of the Second Judicial Circuit. The habeas court appointed counsel to represent Moeller. Also, the court granted Moeller's request to depose the State's soil expert, obtain a new defense soil expert, and hire a new DNA expert. The habeas hearing was held on February 27, 2002. Following the hearing, Moeller

requested and was granted leave to add additional claims. The habeas court issued its memorandum opinion denying relief and quashing the writ. After additional arguments and motions, the court also issued Findings of Fact and Conclusions of Law.

## Analysis and Decision

[¶ 10.] Because a petition of habeas corpus collaterally attacks a final judgment, our review is limited. *Hays v. Weber*, 2002 SD 59, ¶ 11, 645 N.W.2d 591, 595. Habeas review is not a substitute for a direct appeal. *Lien v. Class*, 1998 SD 7, ¶ 10, 574 N.W.2d 601, 606. As a general matter, habeas corpus is used to review only: (1) whether the court has jurisdiction of the crime and the person of the defendant; (2) whether the sentence was authorized by law; and (3) whether, in certain cases, a defendant was deprived of basic constitutional rights. *New v. Weber*, 1999 SD 125, ¶ 5, 600 N.W.2d 568, 571–72. Findings of fact are reviewed under the clearly erroneous standard. *Id.* Habeas corpus petitions are subject to the doctrines of res judicata and collateral estoppel. *Rhines v. Weber*, 2000 SD 19, ¶ 59, 608 N.W.2d 303, 316.

### I.

[¶ 11.] Moeller first contends that the habeas court erred when it concluded that the trial court's decision to admit testimony concerning gahnite was not a trial error that had substantial and injurious effect on the jury's verdict and thereby deprived him of his rights to due process of law as provided by the state and federal constitutions.[1] In essence, this claim is an attempt to revive an issue presented on direct appeal. In *Moeller II*, we examined whether the trial court abused its discretion in ad-

mitting a belated report by Dr. John P. Wehrenberg, the State's soil expert, and in failing to conduct a *Daubert* admissibility hearing on whether "Wehrenberg's testimony was scientifically valid and admissible." 2000 SD 122, ¶¶ 71–75, 616 N.W.2d at 445–46. In affirming the trial court's decision to allow testimony concerning the presence of gahnite, we reasoned that Moeller's right to due process of law was not violated because he was "on notice" that gahnite was of "substantial interest" to the State's expert. *Id.* ¶ 78. Likewise, we held that Moeller's right to due process of law was not abridged by the trial court's decision to forego a *Daubert* hearing because the State's expert's methodology was neither complex nor novel, and because Moeller presented no evidence that the methodology was so flawed as to be unreliable. *Id.* ¶ 86–87.

[¶ 12.] Moeller now challenges these decisions on two fronts. First, he alleges that Wehrenberg's conclusions were "demonstrably false." Moeller bases his allegation on new expert testimony presented by Dr. Edward Duke who concluded that gahnite was not present in the sample tested by the State's expert. Second, Moeller alleges that because the grains identified by the State's expert as gahnite were destroyed before his second trial, he was entitled to an inference that the evidence would not support Wehrenberg's conclusions.

[¶ 13.] Duke's analysis has no effect on our earlier decision. The new evidence does not give us reason to reconsider our conclusion that the trial court was correct in refusing to mandate a *Daubert* hearing before Wehrenberg's testimony and did not abuse its discretion in allowing

1. Gahnite is a rare mineral. According to Perry Rahn, Moeller's soil expert in his second trial, gahnite is less common than gold. At trial, Dr. Wehrenberg testified that he found gahnite in both the wheel well of Moeller's pickup and at the crime scene.

the gahnite evidence. Furthermore, Duke's findings do not change our view that the gahnite evidence was relevant and that Wehrenberg's testimony rested on a reliable foundation. Duke's conclusions merely question the weight of the evidence presented by Wehrenberg, not its admissibility. As we stated in *Moeller II*, "there is [still] no evidence in the record that Wehrenberg's methodology or analysis was so skewed as to alter the otherwise reliable scientific method." *Id.* ¶ 87. At most, Duke's analysis amounts to new evidence. However, newly discovered evidence is not a sufficient ground for habeas relief where no deprivation of a constitutionally protected right is involved. *Boyles v. Weber*, 2004 SD 31, ¶ 11, 677 N.W.2d 531, 538 (citing *Herrera v. Collins*, 506 U.S. 390, 390–91, 113 S.Ct. 853, 855, 122 L.Ed.2d 203 (1993)).

■ [¶ 14.] Moeller asks us to declare, on habeas review, that the evidence destroyed by Wehrenberg would not have been favorable to the State. We are not persuaded that Moeller's right to due process was violated by the destruction of the grains identified by Wehrenberg as gahnite. While the destruction of this evidence is regrettable, it did not taint Moeller's subsequent criminal trial. We find it difficult to envision a constitutional flaw in the proceedings where no party discovered Wehrenberg's destruction until eleven years after the event and where, at the time of destruction, Moeller had in his possession comparable evidence.

[¶ 15.] Even if Moeller had discovered the destruction of the evidence before his trial, it does not necessarily follow that he would have been entitled to such an adverse inference. In *State v. Engesser*, we held that an adverse inference should not be drawn from missing evidence unless it was disposed of intentionally or in bad faith. 2003 SD 47, ¶ 44, 661 N.W.2d 739,

754–55. We reiterated this position in *State v. Bousum*: "mere negligence in the loss or destruction of evidence does not result in a constitutional violation." 2003 SD 58, ¶ 16, 663 N.W.2d 257, 263. Our view on this issue is drawn from well-settled Supreme Court case law. In *California v. Trombetta*, the United States Supreme Court held that due process was not violated when law enforcement officers failed to preserve breath samples despite the introduction of the results of the breath analysis test. 467 U.S. 479, 488, 104 S.Ct. 2528, 2533–34, 81 L.Ed.2d 413 (1984). In reaching this conclusion, the Court reasoned that a state's duty to preserve evidence is "limited to evidence that might be expected to play a *significant role* in the suspect's defense." *Id.* (emphasis added). Evidence plays a "significant role" where the evidence possessed "an exculpatory value that was apparent before the evidence was destroyed, *and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.*" *Id.* at 488–89, 104 S.Ct. at 2534 (emphasis added).

[¶ 16.] Although Moeller argues that Wehrenberg's destruction of evidence was more than mere negligence, we are not convinced. In his deposition, Wehrenberg candidly admitted that he destroyed the evidence. He stated that this was necessary because a substance that he used during his analysis was carcinogenic. He indicated that he was under no direction to destroy the evidence, and that, in fact, the State was unaware that he had done so. Moeller seems to argue that the State's direction to Wehrenberg that he should analyze the grains in a "generalized manner" was tantamount to an instruction by the State to destroy the evidence upon completion of the analysis. However, the habeas court rejected this argument and

instead concluded that Wehrenberg's conduct was negligent and not a calculated effort to destroy exculpatory evidence. We find no fault with the habeas court's finding. There is simply no support in the record that the destruction of the evidence by Wehrenberg was more than mere negligence. Thus, we see no violation of Moeller's right to due process.

[¶ 17.] Our conclusion that the destruction of the "gahnite" grains does not amount to a violation of Moeller's right to due process is furthered by the undisputed fact that at the time of the destruction comparable evidence was available for Moeller's review. True, the samples delivered to Moeller's expert may not have been the identical samples tested by Wehrenberg, but samples taken from both the crime scene and Moeller's vehicle were available for analysis. In fact, these samples were sent to Moeller's soil expert and remained under the control of Moeller's counsel.

[¶ 18.] Given that the record does not reflect that the State acted in bad faith in the destruction of evidence and given that the destruction did not impair Moeller's ability to examine comparable evidence, we conclude that Moeller would not have been entitled to an adverse inference even if he had discovered the destruction of the evidence before his direct appeal. Therefore, we find no error in the habeas court's conclusion that the destruction of the evidence did not amount to a violation of Moeller's constitutionally protected rights.

## II.

[¶ 19.] Moeller next contends that the habeas court erred when it concluded that Moeller was not denied his right to due process of law by the trial court's instructions concerning life imprisonment without parole. During jury deliberations in the sentencing phase of Moeller's second trial, the jury asked, "If the penalty of 'life imprisonment without parole' should be imposed upon the defendant, will he EVER have a chance to appear before a parole board?" (Emphasis in original.) The trial judge responded, "We acknowledge your note asking questions about life imprisonment without parole. All of the information which I can give you is set forth in the jury instructions." Moeller argues now that the trial judge was bound to further define "life imprisonment without parole."

[¶ 20.] Moeller contends that the Due Process Clause forbids the execution of a prisoner where the trial court refused to give a jury instruction defining the meaning of "life without parole." His argument is founded on several United States Supreme Court cases mandating that when a defendant is facing the possibility of execution, and a prosecutor argues that the defendant poses a future threat to society, and a trial court refuses to inform the jury whether life imprisonment precludes the opportunity for parole, the defendant's right to due process has been violated. *See Kelly v. South Carolina*, 534 U.S. 246, 122 S.Ct. 726, 151 L.Ed.2d 670 (2002); *Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994); *Boyde v. California*, 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990).

[¶ 21.] This case is not similar to the ones Moeller cites. As we held in Moeller's direct appeal, "future dangerousness was not specifically raised as a concern by [the] State." *Moeller II*, 2000 SD 122, ¶ 155, 616 N.W.2d at 461. Furthermore, we held that the instructions given to the jury "were an accurate and complete reflection of the law." *Id.* ¶ 156. There is no ambiguity in an instruction that defines life imprisonment as "life without parole." Thus, Moeller's constitutional rights were not violated by the trial

court's instruction and subsequent response to the jury question. Indeed, any further explanation would have been at best redundant and at worst confusing. The trial court was correct in not elaborating on an already proper instruction.

### III.

[¶ 22.] Moeller next contends that the habeas court erred in finding no ineffective assistance of trial counsel. Moeller's first claim in this regard originates from the decision of his trial attorneys not to substantially participate in the *Daubert* hearing on the admissibility of DNA evidence. After our reversal of Moeller's original conviction, the trial court established January 13, 1997 as the date for the hearing on DNA evidence. At Moeller's request, the court rescheduled the hearing for March 3, 1997. On February 19, 1997, Moeller again requested that the court reschedule the hearing. The court denied the request.

[¶ 23.] At the *Daubert* hearing, Moeller's attorneys stated that they were "totally unprepared" to participate in the hearing, and, as a result, they were not "competently and adequately" representing Moeller. Despite this, the court proceeded with the hearing. Moeller's counsel presented no expert testimony in defense and conducted only perfunctory cross-examination. As a result of the hearing, the court found that the DNA evidence was admissible under the *Daubert* standard.

[¶ 24.] In response to the continuance request and unpreparedness statement, the trial court issued findings of fact that explained its decision to deny Moeller's request for a continuance. The court found that the claim of inadequate time to prepare for the hearing was not credible. Furthermore, the court held that the decision of defense counsel "to not call witnesses or examine witnesses at the *Daubert* hearing was a tactical decision made with the intent to create the appearance of error and ineffective assistance of counsel, and not the result of being denied the opportunity to adequately present a defense."[2] On habeas, Moeller now claims that his attorneys' strategy was unreasonable and prejudicial.

[¶ 25.] Moeller argues that the proper test here is whether his substantial rights were affected during the hearing because trial counsel was constructively absent during the *Daubert* hearing. He further argues that our scope in reviewing trial counsel effectiveness is limited to the DNA hearing, a "discrete portion" of the trial. Thus, before proceeding further, we must determine (1) whether the strategy of defense counsel during the hearing amounted to a constructive absence of counsel, and (2) whether the *Daubert* hearing was a "discrete portion" of the trial.

[¶ 26.] Moeller looks to several cases for support on his contention that he was not afforded assistance of counsel during the *Daubert* hearing. However, the cases Moeller relies on are not analogous. This is certainly not a case where trial counsel fell asleep during trial or did not attend the entire trial. Instead, as both the habeas and trial courts found, Moeller's trial counsel embarked on a calculated strategy. While its effectiveness may be questioned, certainly Moeller's representation during the hearing was more than

---

2. In *Moeller II*, this Court determined that the trial court "did not abuse its discretion in denying his motions for a continuance." 2000 SD 122, ¶ 24, 616 N.W.2d at 434. As an aside, we agree with the habeas court's observation that "if defense counsel were allowed to employ tactics which end in a questionable result and then urge the tactic as a significant error requiring a new trial, the mischief which would result would be limitless."

"mere physical presence." The issue presented here is a question of the effectiveness of assistance of counsel, not the lack of it. Thus, Moeller is not entitled to a presumption of prejudice, as he suggests.

[¶ 27.] Nor are we convinced that we may not look beyond the *Daubert* hearing in determining the effectiveness of trial counsel. Moeller contends that we must narrow our review to only the DNA hearing. He cites *Collier v. Turpin*, 177 F.3d 1184, 1196 n. 17 (11thCir.1999) as standing for this proposition. However, Moeller's reliance here is misplaced. In *Collier*, the court noted that in determining whether counsel provided effective assistance, a court should look to each discrete portion of a trial without regard to performances at other times during the trial. *Id.* There, the court reasoned that it would be improper for a court to look at the guilt and sentencing phases in toto. Never did the *Collier* court suggest that it was improper for a court to review counsel's performance at an evidentiary hearing in combination with counsel's performance during the trial. Thus, we see no reason to review in isolation trial counsel performance during the *Daubert* hearing. With our preliminary inquires answered, we proceed to determine whether the strategy of not substantially participating in the *Daubert* hearing amounted to ineffective assistance of counsel.

[¶ 28.] The well-established two-prong test for a claim of ineffective assistance of counsel requires a showing "(1) that counsel's representation fell below an objective standard of reasonableness, and (2) that such deficiency prejudiced the defendant." *Coon v. Weber*, 2002 SD 48, ¶ 11, 644 N.W.2d 638, 642 (citations omitted). " 'The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result.' " *Id.* (quoting *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693 (1984)). Lawyers "are presumed to be competent unless otherwise shown and the reasonableness of counsel's performance is evaluated from counsel's perspective at the time in light of all of the circumstances." *Id.* (citing *Davi v. Class*, 2000 SD 30, ¶ 17, 609 N.W.2d 107, 112). "[A] wrong or poorly advised exercise of judgment is not alone enough to support a subsequent claim of ineffective counsel." *Jones v. Class*, 1998 SD 55, ¶ 23, 578 N.W.2d 154, 162.

[¶ 29.] As a result of the *Daubert* hearing, the trial court allowed the State to introduce DNA evidence using both APO–B and other markers. It is worth noting initially that even now Moeller presents no testimony or other evidence that might have led to the exclusion of any DNA evidence based on any marker other than the APO–B marker at the *Daubert* hearing. His failure to challenge that evidence leads us to the conclusion that even if trial counsel had attempted to prevent its admission, they probably would have failed. Thus, Moeller does not realistically demonstrate that the performance of his defense attorneys in regard to most of the DNA evidence was ineffective.

[¶ 30.] From the above, we can reasonably conclude that trial counsel was faced with the realization that even if the APO–B DNA evidence was excluded, the evidence still showed in the remaining analysis that the probability of a person in the Caucasian population having DNA characteristics common to Moeller's would be 1 in 130 million. While trial counsel did not attack the admissibility of the APO–B DNA evidence, counsel sought during trial to inject reasonable doubt in the minds of the jurors regarding all DNA evidence

presented by the State. Defense counsel vigorously cross-examined the State's DNA experts regarding the methodology, reliability, and control procedures of their testing. Trial counsel obtained an admission from the State's DNA expert that it had only recently been determined that APO–B DNA evidence was reliable and that no other laboratory had made such a determination. In addition, in closing argument, defense counsel repeatedly referred to the lack of validation procedures, not just for the APO–B DNA evidence, but for all DNA evidence presented by the State. In essence, counsel used the questionable reliability of the APO–B DNA evidence to support an inference that the remaining DNA evidence was equally unreliable. Thus, we cannot say that the strategy to forego a vigorous defense against the admission of the APO–B DNA evidence in the *Daubert* hearing was ineffective, where the admission of such evidence was effectively challenged at trial.

[¶ 31.] Next, Moeller claims ineffective assistance of counsel because trial counsel failed to test the mineral identified by the State's expert as gahnite. For this claim, Moeller relies heavily on later testing that concluded that the material found was neither gahnite nor common spinel. However, as we noted above, we review defense counsel performance from their perspective at the time in light of all of the circumstances. *Coon*, 2002 SD 48, ¶ 11, 644 N.W.2d at 642 (citations omitted).

[¶ 32.] At trial, Moeller's soil expert testified that ancient glaciers moving through what is now South Dakota deposited the soils now found in the Minnehaha and Lincoln county areas. Moeller's expert also opined that soils found throughout the eastern part of the state would be substantially similar. Moreover, the expert explained that any mineral deposit, such as gahnite, if found in a specific area

of the state would likely be found in other areas of the state due to the manner in which the soils were deposited. Lastly, the defense expert testified that the mineral found by the State's expert was more likely common spinel, a rare mineral, though not as rare as gahnite.

[¶ 33.] From the testimony, it is clear that instead of attempting to show that the mineral was common spinel rather than gahnite, defense counsel chose to proceed with a theory that the State's expert was mistaken in his conclusion that a soil analysis could isolate any locale in the eastern part of the State. Trial counsel argued that it was irrelevant whether the mineral found was gahnite because, as the defense expert testified, whether the soil was found in Lincoln, Lake, or Minnehaha County, "It's all similar." Proceeding under such a theory was neither unreasonable nor ineffective.

### IV.

[¶ 34.] Moeller argues that the habeas court erred when it concluded that the trial court's decision to admit APO–B DNA evidence was not a trial error that had substantial and injurious effect on the jury's verdict and deprived Moeller of his right to due process of law as provided by the Constitutions of the United States and South Dakota. At the onset, we note that the habeas court ruled that Moeller showed no error on the part of the trial court in admitting the disputed DNA evidence.

[¶ 35.] Moeller argues that the trial court failed to exercise its gatekeeping function when it admitted the APO–B DNA testing results because the evidence was not sufficiently reliable. Moeller points to the fact that *"Moeller II* [is] the only reported decision in which APO–B was determined reliable enough to be admissible." He called an expert who "testi-

fied that the use of APO–B for forensic applications was not generally accepted in the forensic community[.]" Moeller further asserts that the validation process used by the State's DNA expert was insufficient and incomplete. Finally, Moeller argues that as a result the State was able to present evidence that "when the APO–B frequency was included with the other [DNA] markers the likelihood [that Moeller was the perpetrator] went into the range of 1 in 14.8 billion, or a virtual certainty that Moeller was the perpetrator." This Moeller argues was clearly prejudicial.

[¶ 36.] Trial courts have broad discretion in determining whether to admit expert testimony. *State v. Weaver*, 2002 SD 76, ¶ 24, 648 N.W.2d 355, 364. Only where a court abuses its discretion in admitting evidence will we reverse. *Moeller I*, 1996 SD 60, ¶ 51, 548 N.W.2d at 479. In determining whether to admit expert opinion, a court should look to whether the testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue." SDCL 19–15–2. Proposed expert testimony must rest on a reliable foundation and be relevant. *Moeller I*, 1996 SD 60, ¶ 52, 548 N.W.2d at 479. " 'Pertinent evidence based on scientifically valid principles will satisfy those demands.' " *Id.* (quoting *State v. Hofer*, 512 N.W.2d 482, 484 (S.D.1994)). Habeas corpus is a collateral review meant "to afford relief to those whom society has 'grievously wronged.' " *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 1721, 123 L.Ed.2d 353 (1993). Where a constitutional error exists, the State must show that the error was harmless. *Id.* at 641, 113 S.Ct. 1710 (Stevens, J., concurring). A habeas court's findings of fact are given "considerable deference" and as such are reviewed under a clearly erroneous stan-

dard. *Rhines*, 2000 SD 19, ¶ 9, 608 N.W.2d at 306.

[¶ 37.] An assertion that we must find error in the admission of the APO–B DNA evidence merely because no other reported decision has deemed it admissible is immaterial. While prior admission of similar evidence in other jurisdictions may assist a trial judge in determining whether to admit evidence, we do not see the lack of reported precedent as an outright impediment against admission.

[¶ 38.] In regard to the validation process, Moeller contends that (1) the State's expert failed to deliver to Moeller certain documents regarding the validation process, (2) untrained personnel (students) conducted the validation, and (3) the validation studies were not complete before the testing. The habeas court specifically rejected each of these assertions in its Findings of Fact and Conclusions of Law. The habeas court found:

\* \* \*

19.

\* \* \*

p. Moeller's belief that validation reports were never turned over to the defense and were discarded by Dr. Schanfield stems from his confusion over:

i. . . . .

ii. . . . .

iii. The time frame of the initial validation studies and what occurred thereafter in relationship to the second trial.

iv. Work done with students to determine whether laboratory models could be duplicated with some relative ease.

q. Merely because Moeller is confused about some of the data or what its

implication might be does not imply that it was never disclosed.

r. This Court is left with the firm impression that all available APO–B material and information had been disclosed during discovery leading up to the second trial.

s. [The State's expert's] validation information was published, and that certainly preserved the information Moeller now seeks.

t. While the Court is of the opinion that discovery of APO–B material was adequate and court orders satisfied, nothing satisfies Moeller. After giving him everything required, he wants more even when his hired expert concluded that some of it was unnecessary. Having received everything directly involved in testing the samples in this case, Moeller wants to go back further to ask for data from an earlier time. It is not necessary. This approach is consistent with Moeller's past approach of attacking [the State's expert].

20.

\* \* \*

c. Being peer reviewed is only one criteria to look at. That was satisfied at the 1997 Daubert hearing.

d. In the years between 1992, when Dr. Schanfield was working on APO–B studies, and 1997, when the second trial began, Dr. Schanfield continued his work on APO–B markers. By the retrial in Moeller II, Dr. Schanfield had presented his validation studies on APO–B at regional forensics meetings.

e. There is a disagreement within the DNA community about APO–B markers.

  i. Dr. Eisenberg has a strong, subjective opinion about the validity

of APO–B as a useful DNA marker. However, she never read AGTC's presentation of their validation studies. Dr. Eisenberg was not even sure whether she needed to review the database gels used by AGTC. She had not read the *Daubert* hearing record; as a result, she did not have a full understanding for Dr. Schanfield's opinion. Dr. Eisenberg indicated that even the bioblots would not be necessary for her review. Rather, what concerned her was her fundamental, subjective belief that APO–B was not a good, reliable marker despite contrary testimony.

  ii. Dr. Robin Cotton of Cellmark Labs testified at the *Daubert* hearing that there is no particular objection to the APO–B marker, and APO–B is a perfectly good marker.

[¶ 39.] Moeller presents nothing that might lead us to the conclusion that these findings are clearly erroneous. He rests his assertion on the rejected testimony of his expert at the habeas hearing, testimony refuted by the State's DNA expert. Therefore, we see no reason to disturb the habeas court's findings.

[¶ 40.] The validation process conducted by the State's expert may not have satisfied every critic; however, that is not the standard. In determining the reliability of scientific testimony, we have oft pointed to the non-exhaustive list of guidelines delineated in *Daubert*. *See Weaver*, 2002 SD 76, ¶ 25, 648 N.W.2d at 364; *State v. Guthrie*, 2001 SD 61, ¶ 35, 627 N.W.2d 401, 416. In *Weaver*, we quoted eight such guidelines from *Guthrie*:

(1) whether the method is testable or falsifiable; (2) whether the method was subjected to peer review; (3) the known or potential error rate; (4) whether standards exist to control procedures for the method; (5) whether the method is generally accepted; (6) the relationship of the technique to methods that have been established as reliable; (7) the qualifications of the expert; and (8) the non-judicial uses to which the method has been put. (Internal citations omitted.)

*Id.* The fundamental error in Moeller's argument is that he now wishes to interpose certain scientific standards of validation on our *Daubert* guidelines of admissibility. For example, Moeller apparently believes that because certain standards in the DNA community dictate that peer review be conducted before testing a sample, the *Daubert* guideline that a method be subjected to peer review must not have been met. Expert testimony need only be based on a "reliable foundation." *Weaver*, 2002 SD 76, ¶ 24, 648 N.W.2d at 364. There is no requirement that the foundation be one that is absolutely accepted throughout the scientific community. Moeller rests his entire argument on the premise that the State's expert failed to meet the rigorous validation processes of the DNA community. He devotes no ink to explaining where the State's expert failed to meet our admissibility requirements. At most, Moeller's arguments are a tangential attack on whether the method used by the State's expert was generally accepted in the scientific community. However, these attacks do not persuade us to declare that the trial court abused its discretion in admitting the evidence.

■■■■ [¶ 41.] In furtherance of our belief that the trial court did not err in admitting the disputed DNA evidence, we note that the habeas court effectively conducted what might be referred to as a "post-conviction" *Daubert* hearing. During the habeas hearing, Moeller's DNA expert was allowed to testify at length on problems she perceived in the APO–B testing. However, even at this stage, Moeller's expert was unable to convince the habeas court that the evidence based on the APO–B marker failed to meet our admission standards. All the habeas court found was that there is disagreement in the DNA community on whether APO–B is a valid marker. Again, perfect agreement is not a prerequisite to admission of scientific evidence.

.

## V.

### A. Prosecutorial Discretion

■■■■ [¶ 42.] Moeller contends that the habeas court erred when it concluded that failure to follow the procedures outlined in SDCL 23A–27A was not a structural error affecting the entire trial process depriving him of his rights to due process and equal protection of the law, and violating the doctrine of separation of powers as provided by our state and federal constitutions. Unquestionably, the State in the exercise of its discretion may choose whether to prosecute individuals and what charges to bring against them. There is also no question that this general principle extends to the prosecution of a person suspected of committing a crime for which the penalty, upon conviction, is either life imprisonment or execution by lethal injection. The question before us here is this: does the State, in addition to having the discretion to decide that it will seek the conviction of a person for a capital crime, also have the discretion to decide whether it will seek the death penalty in a given case? Moeller argues that allowing the State such discretion violates our statutes and the Due Process and Equal Protection Clauses of the Fourteenth Amend-

ment.[3] Our answer to this question has important consequences for, among other things, the size of the pool of cases considered when fair proportionality of sentencing is challenged.

■ [¶ 43.] SDCL Chapter 23A–27A provides the statutory scheme for the prosecution of capital crimes. A review of the initial sections, quoted in part, will clarify the context of the question. According to § 23A–27A–1, "in all cases for which the death penalty may be authorized, the judge ... shall include in instructions to the jury for it to consider, any mitigating circumstances and any of the [ten] aggravating circumstances which may be supported by the evidence...." SDCL 23A–27A–2 provides: "In all cases in which the death penalty *may* be imposed and which are tried by a jury, ... the court shall resume the trial and conduct a presentence hearing before the jury." *Id.* (emphasis added). (The meaning of the *"may"* in that statute is that the imposition of the death penalty lies within the jury's limited discretion. The limitation of that discretion is provided by § 23A–27A–4: "If, upon a trial by jury, a person is convicted of a Class A felony, a sentence of death shall not be imposed unless the jury verdict at the presentence hearing includes a finding of [1] at least one aggravating circumstance and [2] a recommendation that such sentence be imposed." (enumeration added).) SDCL 23A–27A–2 continues: "Such hearing shall be conducted to hear additional evidence in mitigation and aggravation of punishment. At such hearing the jury shall receive all relevant evidence, including: (1) Evidence supporting any of the aggravating circumstances listed under § 23A–27A–1; ... [and] (4) All evidence concerning any mitigating circumstances." Then, according to § 23A–27A–3, the jury, after argument of counsel in the presentencing hearing, "shall retire to determine whether any mitigating or aggravating circumstances ... exist."

■ [¶ 44.] Moeller relies on *dictum* from *State v. Clothier*, 381 N.W.2d 253 (S.D.1986), to support his argument that it is not within the statutory discretion of the prosecution to decide whether to seek the death penalty.[4] In *Clothier*, the prosecutor announced that he would not seek the death penalty *if the defendant were convicted* of the charged offense of first-degree murder. Nonetheless, although the defense certainly did not object to the prosecutor's waiving of the death penalty, defense counsel insisted that the jury had to be death qualified because the applicable statutes mandated that all convictions for first degree murder were death penalty eligible and only a jury could decide life or death as the appropriate punishment. Reasoning that the jury could not impose the death penalty if the prosecutor declined to offer evidence or argument in support of it, the trial court refused to death qualify the jury. At the end of the trial, the jury returned a verdict of first degree manslaughter, making the question moot. Nonetheless, on appeal, this Court wrote,

3. We review constitutional questions *de novo*. *State v. Dillon*, 2001 SD 97, ¶ 12, 632 N.W.2d 37, 43.

4. *Dictum* is the abbreviation for *"obiter dictum,"* the plural being *"obiter dicta." Dicta* are pronouncements in an opinion unnecessary for a decision on the merits. As Chief Justice Marshall explained in *Cohens v. Virgi-* nia, *dictum* should be avoided because, among other reasons, it is usually made through inadequate effort in its formulation. 19 U.S. (6 Wheat.) 264, 5 L.Ed. 257 (1821). *See also* Richard B. Cappalli, The American Common Law Method, 18–19 (Transnational Publishers 1997).

The procedure for ascertaining the punishment and possible imposition of the death penalty ... is provided by SDCL [Chapter] 23A–27A [ ].[5] Nothing in this [Chapter] authorizes the prosecutor or judge to determine the penalty prior to a guilty verdict. The procedure is provided in SDCL [Chapter] 23A–27A [ ], which should be followed in capital cases.

*Id.* at 258. In a footnote, the Court went on to state:

If the prosecutor has a recommendation, he may state it at the presentence hearing provided by SDCL 23A–27A–2. There may be situations where the State has no evidence of aggravating circumstances proscribed in SDCL 23A–27A–1 to justify the death penalty; but, SDCL 23A–27A–3 indicates the jury is to determine the mitigation or aggravation, unless it is a nonjury case, then the judge conducts the presentence hearing. SDCL 23A–27A–6.

▇▇▇ [¶ 45.] First, we must repeat that this conclusion in *Clothier* cannot be understood as other than *dictum*. Since, as the *Clothier* court noted, "the penalty issue for first-degree murder was rendered moot when the jury failed to find him guilty of that charge," the issue was not properly before it. *Clothier*, 381 N.W.2d at 258. It is a fundamental principle of our jurisprudence that courts do not adjudicate issues that are not actually before them in the form of cases and controversies.

▇▇▇ [¶ 46.] Second, an aggressive reading of these passages in *Clothier*, such as Moeller proposes, would result in absurdity. Suppose, for example, that, in *Clothier*, the jury had convicted the defendant of first-degree murder. The putative holding in *Clothier* would require that the verdict be thrown out because the option of death had been illegally eliminated, even though there was no evidence offered or sought to be offered in support of it. Worse, this reading of the statute, that both the State and the defense are obliged to present evidence (because "the jury *shall* receive" "all relevant evidence" and *shall* hear "[a]ll evidence concerning any mitigating circumstances"), is impossible, for it contravenes the fundamental principle that the defense cannot be required to present any evidence whatever. SDCL 23A–27A–2 (emphasis added). *See* U.S. CONST. amend. V. Moreover, the *Clothier* Court's suggestion that the prosecutor can only state a recommendation in the sentencing phase has no basis in the statutes, including the one the Court cites for it. To follow *Clothier's* *dictum* literally, removing all prosecutorial discretion in assessing the facts to support a death penalty sentence, would radically transform our system into a process "totally alien to our notions of criminal justice." *Moeller I*, 1996 SD 60, ¶ 132, 548 N.W.2d at 494. In sum, we must fall back on the rule of statutory construction that requires us to give a sensible reading to statutes. *See, e.g., State v. Barton*, 2001 SD 52, ¶ 8, 625 N.W.2d 275, 278 (citations omitted). We presume that the Legislature intended no absurd or unreasonable result. *Id.* Thus, we set aside *Clothier's* dictum.

[¶ 47.] Turning to the individual sections, then, one finds that § 23A–27A–1 requires the judge to include in instructions to the jury that it consider any mitigating circumstances and any of the ten aggravating factors "which *may* be supported by the evidence." SDCL 23A–27A–

---

5. The *Clothier* opinion mistakenly cites SDCL 23A–27A–10, rather than the entire chapter 23A–27A, in this and the next sentence.

1 (emphasis added). SDCL 23A–27A–1 refers to the situation obtaining before the jury retires to consider the question of guilt, and the "may" *refers to* the possibility that the evidence will support a mitigating or aggravating factor *and at the same time implies* that instructing the jury on that possibility lies within the discretion of the judge. That is, the trial court, not the prosecution, makes the initial decision whether the jury is to receive instructions on the mitigating or aggravating factors to be considered in the determination of guilt.

[¶ 48.] SDCL 23A–27A–2 takes effect only after the jury has returned a verdict of guilty. At that point, the jury hears "additional evidence in mitigation and aggravation of punishment. In such a hearing, the jury *shall* receive *all* relevant evidence, including . . . [e]vidence supporting *any* of the aggravating circumstances listed under § 23A–27A–1" as well as "[a]ll evidence concerning any mitigating circumstances." *Id.* (emphasis added). At this point, the discretion of the parties and the trial court is limited to the latter's determination of the relevance of proffered evidence: the court is obliged to allow (for "the jury *shall* hear") both the State and the defense to present "all relevant evidence." That is, the court *shall* allow the prosecution to present all relevant evidence supporting any of the aggravating factors, and the defense to present all relevant evidence concerning any mitigating factors. Relevant evidence includes "[e]vidence supporting *any* of the aggravating" factors and "*all* evidence concerning *any* mitigating circumstances."

[¶ 49.] We assume that statutes mean what they say. *South Dakota Subsequent Injury Fund v. Casualty Reciprocal Exch.*, 1999 SD 2, ¶ 17, 589 N.W.2d 206, 209. Quite clearly, § 23A–27A–2 means that the jury is to hear all relevant evidence that either side wishes to present. Accordingly, when "the prosecution intends to seek the death penalty," nothing more—or less—can be meant than that the prosecution believes that, if the case goes to trial, it has sufficient evidence to support a jury finding that one or more of the aggravating factors exist in the case and that any mitigating evidence will be found an insufficient counterweight to preclude a death sentence.[6] On the other hand, when "the prosecution does not intend to seek the death penalty," the meaning can be either (1) that the prosecution believes it has insufficient evidence to support a jury finding that aggravating factors exist in the case or (2) that it has proposed—and the court has agreed—that (a) at the conclusion of the *culpability* phase, the jury will be given *no* instructions on aggravating factors—without which a death sentence cannot be imposed—and, therefore (b) the jury need not be death-qualified. To underscore the point, neither the defense nor the prosecution may be prevented from presenting relevant evidence to the jury in the *penalty* phase of the trial. The notion that prosecutorial discretion exists in the penalty phase is a distraction. The only discretion in the penalty phase is that of the trial court to determine relevance in accordance with standard canons of evidence.

[¶ 50.] Revisiting *Clothier's* dictum with the preceding analysis in hand, we can now state that its interpretation was off the mark in declaring that "[n]othing in this [Chapter] authorizes the prosecutor or judge to determine the penalty prior to a guilty verdict." 381 N.W.2d at 258. The *Clothier* court wrote: "The issue of pun-

---

6. Of course, the case may not go to trial if the defendant has agreed to plead guilty to a lesser charge.

ishment by death was eliminated prior to trial by the prosecutor and the court, which left as the only punishment life imprisonment if convicted of first-degree murder." *Id.* The reality is that under § 23A–27A–1, once the prosecutor announces an intention to proffer no evidence to support any aggravating circumstance, there are no aggravating factors for the jury to consider, and thus no other penalty than life imprisonment can be imposed.

[¶ 51.] As for Moeller's constitutional challenge to the prosecution's discretion in seeking the death penalty, we adhere to our holding in *Moeller II* that "[s]elective enforcement of SDCL 23A–27A–1 and 22–16–4 is insufficient to show that the statutes have been unconstitutionally applied to a specific defendant, absent a showing that the particular selection was deliberately based on an unjustifiable standard such as race, religion or other arbitrary classification." 2000 SD 122, ¶ 165, 616 N.W.2d at 463. Moeller insists that, because the State assumed a prerogative to pursue the death penalty in his case, he has been denied due process of law and the equal protection of the laws as guaranteed by the Fourteenth Amendment. The State took this decision, however, even before the trial began, in order to obtain a death-qualified jury. Moeller has presented no evidence that the prosecution exercised unlawful discretion. Accordingly, Moeller's challenge fails.

### B. Proportionality Review

[¶ 52.] In *Rhines,* this Court set forth its interpretation of proportionality review in capital cases. 1996 SD 55, 548 N.W.2d

at 415. Moeller asserts that, by restricting proportionality review to the decisions of other capital sentencing authorities, we are abridging all convicted defendants' rights to due process and equal protection of the laws as protected under the Fourteenth Amendment. Moeller urges that we should instead expand the pool of similar cases to include all homicide cases that were prosecuted or could have been prosecuted under the State's current capital punishment scheme. The nub of Moeller's argument is that there is an unconstitutional element of arbitrariness in the size of the pool for comparison under proportionality review. According to Moeller, this arbitrariness results from this State's current practice of vesting in the Attorney General and State's Attorneys the decision whether to seek the death penalty.

[¶ 53.] As we stated in our discussion of Moeller's other issue, there was no illegitimate prosecutorial discretion involved here in the decision whether to seek the death penalty. Since there is no illegitimate discretion, there can be no element of arbitrariness. We see no compelling reason here to retrace that discussion—or its predecessors in *Rhines* and *Moeller.* Accordingly, we hold that our treatment of proportionality review is constitutional.[7]

### VI.

[¶ 54.] Moeller argues that the habeas court erred when it concluded that the process by which Moeller was charged, convicted, and sentenced to death was not defective in some substantial form required by law. Moeller relies on the Su-

7. Moeller cites to *Palmer v. Clarke,* 293 F.Supp.2d 1011 (D.Neb.2003), as analogous. In *Palmer,* on habeas review the federal district court determined that the Nebraska Supreme Court's practice of limiting review to "cases in which the death penalty [had] been imposed ... violated [the defendant's] due

process rights[.]" *Id.* at 1042–43. Our review is not limited to cases in which the death penalty was actually imposed; we review cases in which the death penalty might have been imposed. Thus, Moeller's cited precedent is distinguishable.

preme Court's decision in *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), for his argument that his constitutional rights were violated when the State failed to list in the indictment the statutory aggravators that it intended to use to support his death sentence. However, in *Schriro v. Summerlin,* —— U.S. ——, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004), the United States Supreme Court made clear the limited application of its ruling in *Ring.* Writing for the majority of the Court, Justice Scalia unequivocally explained, "*Ring* announced a new procedural rule that does not apply retroactively to cases already final on direct review." *Id.* at 2526. Moeller's direct review was final August 30, 2000. *Moeller II,* 2000 SD 122, 616 N.W.2d 424. *Ring* did not announce its new procedural rule until 2002. 536 U.S. at 584, 122 S.Ct. at 2428. As such, the rule does not apply to Moeller.

[¶ 55.] Even if we were to conclude that the Court's decision in *Ring* was applicable here, we do not believe that the new rule would provide relief. South Dakota's Constitution permits a charge to be brought by indictment or information. SD Const. art. VI, § 10. To gain a thorough grasp of the holding in *Ring,* we must examine two earlier decisions. The first was *Jones v. United States,* 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999). The rule from that case is succinctly stated in the concurring opinions of Justices Stevens and Scalia: "[I]t is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed. It is equally clear that such facts must be established by proof beyond a reasonable doubt." *Id.* at 252–53, 119 S.Ct. at 1228–29 (opinion of Stevens, J.); *see also* 526 U.S. at 253, 119 S.Ct. at 1229 (opinion of Scalia, J.). The second case was *Apprendi v. New Jersey,*

530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), where the Court wrote: "[U]nder the Due Process Clause of the Fifth [and Fourteenth] Amendment[s] and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in the indictment, submitted to a jury, and proven beyond a reasonable doubt." *Id.* at 476, 120 S.Ct. at 2355 (emphasis added).

[¶ 56.] Adhering to its holdings in *Jones* and *Apprendi,* the Supreme Court in *Ring* struck down Arizona's capital sentencing structure. There, in an opinion authored by Justice Ginsburg (joined by Justices Stevens, Scalia, Kennedy, Souter and Thomas), the Court held that in examining alleged aggravating factors that would justify imposing the death penalty requires a jury, not a judge, to find the existence of such factors beyond a reasonable doubt. *See Ring,* 536 U.S. at 609, 122 S.Ct. at 2443. Arizona law had allowed a judge to determine the existence of aggravating and mitigating factors in deciding to impose death. The Court summed up its holding as follows: "If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt." *Id.* at 586, 122 S.Ct. at 2430.

[¶ 57.] Moeller believes that the federal constitution, as interpreted by the Supreme Court in these three recent decisions, makes unconstitutional South Dakota's procedure in giving the statutory aggravators through means other than in an indictment. In *Ring,* the Court held that because Arizona's enumerated aggravating factors operate as "the functional equivalent of an element of a greater offense," the Sixth Amendment requires that they be found by a jury.

536 U.S. at 609, 122 S.Ct. at 2443. From this Moeller reasons that aggravating circumstances are "elements" that must be alleged in an indictment or information. Thus, he argues, because the State did not allege the aggravators in the indictment, it was defective and the court lacked jurisdiction to impose the death sentence.

[¶ 58.] We reject these arguments for three reasons.[8] First, *Ring* did not hold that indictments in capital cases must allege aggravating and mental state factors. *See id.* at 597 n. 4, 122 S.Ct. at 2437 n. 4 ("Ring does not contend that his indictment was constitutionally defective."). *Ring* held that Arizona's aggravating factors operate as "the *functional equivalent of an element* of a greater offense," but did not hold that such factors become actual elements in a new substantive offense. *Ring*, 536 U.S. at 609, 122 S.Ct. at 2443 (quoting *Apprendi*, 530 U.S. at 494 n. 19, 120 S.Ct. at 2365 n. 19) (emphasis added). *Apprendi* declared that the "substantive basis for . . . [the] enhancement is thus not at issue; the *adequacy of . . . [the] procedure is.*" *Apprendi*, 530 U.S. at 475, 120

S.Ct. at 2354 (emphasis added); *see also Cannon v. Mullin*, 297 F.3d 989, 994 (10thCir.2002) ("that *Apprendi* announced a rule of criminal procedure forecloses . . . argument that *Ring* announced a substantive rule."). *Jones* stated that "[t]he constitutional safeguards that figure in our analysis concern *not the identity of the elements defining criminal liability* but only the required procedures for finding the facts that determine the maximum permissible punishment. . . ." 526 U.S. at 243 n. 6, 119 S.Ct. at 1224 n. 6 (emphasis added).[9]

[¶ 59.] Second, although the State did not allege its statutory aggravating circumstances in the indictment, it gave Moeller advance formal notice of which statutory aggravators it was going to rely on in its written notice of intent to seek the death penalty. The notice was given on September 3, 1996, and the jury was sworn in on April 28, 1997, some eight months later. The Court in *Jones*; *Apprendi*, and *Ring* dealt with the indispensable role of the jury in deciding criminal cases.[10] These cases did not address

---

**8.** Federal courts have come down on both sides of the question. *See e.g., United States v. Lentz*, 225 FSupp2d 672, 675 (E.D.Va.2002) ("[T]he Supreme Court did not mandate that a fact that must be found to increase punishment beyond that authorized by the jury verdict constitutes an actual element of a new substantive crime. All *Ring* stands for is that any factual determination necessary to impose the death penalty must be found by a jury beyond a reasonable doubt"). "Defendants are correct that, in light of *Ring v. Arizona*, 536 U.S. 584, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), the statutory aggravating factors 'must . . . be alleged in the indictment and found by a jury.'" *United States v. Matthews*, 246 FSupp2d 137, 142 (N.D.N.Y.2002) (quoting *United States v. Quinones*, 313 F.3d 49, 53 n. 1 (2dCir.2002)). *See also United States v. Sampson*, 245 F.Supp.2d 327 (D.Mass.2003).

**9.** This was Justice Scalia's understanding of the holding as well. *See e.g., Ring*, 536 U.S. at 612–13, 122 S.Ct. at 2445 (Scalia, J., concurring) ("What today's decision says is that the jury must find the existence of the *fact* that an aggravating factor existed. Those States that leave the ultimate life-or-death decision to the judge may continue to do so—*by requiring a prior jury finding of [an] aggravating factor in the sentencing phase* or, more simply, by placing the aggravating-factor determination (where it logically belongs anyway) in the guilt phase.") (emphasis added).

**10.** The Court noted that of the thirty-eight states that impose the death penalty, twenty-nine states, including South Dakota, "commit sentencing decisions to juries." *Ring*, 536 U.S. at 608 n. 6, 122 S.Ct. at 2442 n. 6. Certainly, there is no suggestion that the *Ring* Court believed its holding left South Dakota's death penalty scheme unconstitutional.

whether notice of an aggravating factor had to be conveyed to the defendant only by means of an indictment or information, as opposed to some other means. We are satisfied that the holdings in these three cases have not been transgressed here.[11] The notice of aggravating factors given to Moeller was sufficient. Other state courts have held likewise. *See Terrell v. State,* 276 Ga. 34, 572 S.E.2d 595 (2002) (state not under constitutional obligation to place statutory aggravators in the indictment); *State v. Edwards,* 810 A.2d 226 (R.I.2002) (same). The jury found beyond a reasonable doubt the existence of the statutory aggravators that were in the State's notice. That same jury sentenced Moeller to death.

[¶ 60.] Third, it must be kept in mind that this is a state criminal case. In *Hurtado v. California,* 110 U.S. 516, 538, 4 S.Ct. 111, 122, 28 L.Ed. 232, 239 (1884), the Supreme Court held that the requirement of a grand jury indictment set forth in the Fifth Amendment to the Constitution of the United States was not applicable to the states. The Supreme Court has never overruled *Hurtado.* Thus, as acknowledged in both *Apprendi* and *Ring,* there is no federal requirement that a state felony prosecution, including a capital case, be commenced by an indictment issued by a grand jury. Under South Dakota's Constitution and statutes, an information signed by the prosecutor is an adequate method of bringing a criminal charge. We see no reason why a notice of aggravating factors is not similarly permissible, so long as a jury has the ultimate decision on whether those factors have been proved beyond a reasonable doubt.

[¶ 61.] Insofar as Moeller had considerable advance notice of the aggravating factors to be considered in the sentencing phase of his case and the jury considered those factors and found them to exist beyond a reasonable doubt, *Ring's* holding, if applicable, has been followed here. Our analysis is bolstered by the Supreme Court's recent decision in *Blakely v. Washington,* —— U.S. ——, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). There, the Court succinctly summed up its precedents, stating that "the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." Id.* at 2537 (citations omitted) (emphasis in original). The clear import of the language is that where a jury finds aggravating factors or where a defendant admits to aggravating

11. Moeller asks us to attribute some legal significance to the Eighth Circuit case of *United States v. Allen,* 357 F.3d 745 (8thCir.2004). The *Allen* court held that failure to allege mental culpability and aggravating factors in a capital defendant's indictment violates the Fifth Amendment indictment clause. *Id.* at 747–48. Moeller believes this decision supports his view that the information here should have included the aggravating factors used against him. We do not believe that the 8th Circuit's recent decision bears any significance here. As we point out above, in *Ring,* a state criminal case, the defendant did not contend that his indictment was constitutionally defective, and the Supreme Court did not hold that Ring's indictment was defective for failing to allege the aggravating factors in the indictment. *See Ring,* 536 U.S. at 597 n. 4, 122 S.Ct. at 2437 n. 4. *Allen* is a federal criminal case and the requirement of a grand jury indictment in the Fifth Amendment is not applicable to the states, as declared in the *Hurtado* decision cited above. Thus, there is no federal constitutional requirement that a *state* felony prosecution, including a capital case, be commenced by an indictment issued by a grand jury. A close reading of the Allen decision supports our analysis. The foundation of the decision in *Allen* rests entirely on the Fifth Amendment's mandate that all "capital or otherwise infamous crime" be brought solely by grand jury indictment. South Dakota has no such requirement. Thus, the foundation upon which the *Allen* Court based its opinion is not applicable here.

factors, a judge may use such factors to increase a defendant's sentence. The trial court here made no findings independent of the jury findings. We conclude that Moeller's constitutional rights as delineated in *Jones*; *Apprendi*, and *Ring* were not violated.

[¶ 62.] Affirmed.

[¶ 63.] GILBERTSON, Chief Justice and ZINTER, Justice, and WILBUR, Circuit Court Judge, and MILLER, Retired Justice, concur.

[¶ 64.] WILBUR, Circuit Court Judge, sitting for SABERS, Justice, disqualified.

[¶ 65.] MILLER, Retired Justice, sitting for MEIERHENRY, Justice, disqualified.