#24092-a-SLZ

**2007 SD 67**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

    v.

NICOLE MARIE MULLIGAN,                    Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FIFTH JUDICIAL CIRCUIT
WALWORTH COUNTY, SOUTH DAKOTA

* * * *

HONORABLE LARRY H. LOVRIEN
Judge

* * * *

LAWRENCE E. LONG
Attorney General

GARY CAMPBELL
Assistant Attorney General              Attorneys for plaintiff
Pierre, South Dakota                    and appellee.

RICHARD A. SOMMERS
MELISSA E. NEVILLE of
Bantz, Gosch & Cremer                   Attorneys for defendant
Aberdeen, South Dakota                  and appellant.

* * * *

ARGUED ON MARCH 19, 2007

OPINION FILED **07/11/07**

#24092

ZINTER, Justice

[¶1.] Nicole Mulligan was convicted of first degree manslaughter in the death of her boyfriend, Richard Goldade. She appeals claiming that: the State failed to prove criminal intent; her restitution sentence was illegal; a *Batson* violation occurred; and a spoliation of evidence instruction should have been given. We affirm.

## Facts and Procedural History

[¶2.] On October 15, 2002, Mulligan shot Goldade with a .357 revolver in their home in Mobridge, South Dakota. Mulligan claimed that the shooting was accidental. According to her version of events, she was about to give her dogs a bath when Goldade came home from work. Mulligan was looking in a closet for towels to bathe the dogs and found the gun. She claimed that she wanted the gun moved because the couple's three year-old son was starting to climb and he would go into the closet to get dog treats. She indicated that she covered the gun with a towel so her son would not see it. As she was handing it to Goldade to have him lock it in a gun cabinet, the gun discharged. The bullet hit Goldade in his chest and lodged in his back. Bob Rivera, a friend, was working on Mulligan's computer in another room at the time of the shooting. He heard the shot, ran into the living room, and called 911. Before dying later that evening, Goldade made statements that the gun accidentally discharged.

[¶3.] The State's version of the shooting was very different. It presented evidence that in his post-shooting statements, Goldade was unable to recall how the shooting occurred. There was also evidence that Mulligan's stories were

inconsistent. Initially, she said that she was holding the gun in one hand with the towels over the gun and her other hand over the towels. However, physical testing revealed that burn marks on the towels were inconsistent with all of the towels being on top of the gun. The tests indicated that at the time the gun discharged, it was between the towels. Mulligan then changed her story to match this physical evidence. There was also evidence that although all of the other guns in the house had ammunition in their magazines, none had rounds in the chamber. Therefore, the other guns could not have fired immediately (accidentally) as Mulligan claimed with respect to the .357 revolver.

[¶4.] The State also introduced evidence suggesting that Mulligan had a reason to kill Goldade. According to the State's evidence, Mulligan filed for bankruptcy in 1997, primarily due to credit card debt. In the year preceding the shooting, and without Goldade's knowledge, Mulligan had again amassed approximately $37,000 in credit card debt, much of it in Goldade's name. In fact, Mulligan changed the addresses on some of Goldade's credit cards to a post office box in Mobridge so that the statements did not come to the home. Mulligan had also forged Goldade's name on various financial documents and written checks to herself on his account. There was evidence that had he discovered these facts, Goldade would have been extremely upset as it would have destroyed his plans to build a new home. Moreover, a letter written by Mulligan was introduced indicating that Goldade was contemplating making Mulligan and their son move out. Finally, the State offered physical evidence that this gun could not have discharged without the direct application of substantial pressure on the trigger.

[¶5.]     Mulligan was charged in the alternative with first degree murder and first degree manslaughter. She did not object to the manslaughter charge. At trial, the primary issue was whether Mulligan accidentally or intentionally shot Goldade. A *Batson* challenge was also raised because the State struck all five Native Americans from the jury. The trial court ruled that the State had presented sufficient race-neutral reasons for the strikes. At the conclusion of the trial, a dispute arose over a spoliation instruction.

[¶6.]     The jury convicted Mulligan of first degree manslaughter. She was sentenced to thirty-five years in the state penitentiary with seventeen years suspended. The trial court also ordered restitution for several things, including the money Mulligan stole from Goldade. Mulligan appeals raising four issues:

1. Whether the evidence of intent was sufficient to support a conviction of first degree manslaughter.

2. Whether, in the absence of an admission or conviction, the trial court's order of restitution for theft was an illegal sentence.

3. Whether Mulligan's constitutional rights of due process and equal protection were violated by the State's use of peremptory strikes to remove Native Americans from the jury.

4. Whether the trial court abused its discretion and committed prejudicial error in refusing Mulligan's proposed jury instruction on spoliation of evidence.

**Decision**

*Sufficiency of the Evidence*

[¶7.]     Mulligan first contends that the State failed to prove the criminal intent necessary for first degree manslaughter. She concedes that the State produced motive evidence, but argues that the State failed to provide sufficient

evidence of criminal intent. The standard of review for determining the sufficiency

of the evidence is well settled.

> "In determining the sufficiency of the evidence on appeal in a criminal case, the issue before this Court is whether there is evidence in the record which, if believed by the jury, is sufficient to sustain a finding of guilt beyond a reasonable doubt." In making that determination, "we accept the evidence and the most favorable inferences fairly drawn therefrom, which will support the verdict." Moreover, "the jury is. . .the exclusive judge of the credibility of the witnesses and the weight of the evidence." Therefore, this Court does not resolve conflicts in the evidence, or pass on the credibility of witnesses, or weigh the evidence. State v. Laplante, 2002 SD 95, ¶19, 650 NW2d 305, 310 (internal citations omitted). Thus, "[a] guilty verdict will not be set aside if the state's evidence and all favorable inferences that can be drawn therefrom support a rational theory of guilt." State v. Jones, 521 NW2d 662, 673 (SD 1994) (citation omitted).

State v. Pasek, 2004 SD 132, ¶7, 691 NW2d 301, 305.

[¶8.]    Mulligan was acquitted of first degree murder and convicted of first

degree manslaughter. As is relevant here, homicide[1] is murder in the first degree

"[i]f perpetrated without authority of law and with a premeditated design to effect

the death of the person killed . . . ." SDCL 22-16-4. "Homicide is manslaughter in

the first degree if perpetrated: Without any design to effect death . . ., but by

---

1.    SDCL 22-16-1 defines homicide.

> Homicide is the killing of one human being, including an unborn child, by another. Homicide is either:
>
> (1) Murder;
> (2) Manslaughter;
> (3) Excusable homicide;
> (4) Justifiable homicide; or
> (5) Vehicular homicide.

   *Id.*

means of a dangerous weapon . . . ." SDCL 22-16-15. Thus, in order to sustain the manslaughter conviction, the State must have proved that Mulligan acted without a design to effect the death of Goldade but did so by means of a dangerous weapon. The matter in dispute is whether the State proved that Mulligan acted with criminal intent.

[¶9.] Manslaughter does not require specific intent. *See* SDCL 22-16-15. It is a general intent crime. State v. Bittner, 359 NW2d 121, 128 (SD 1984) (Morgan, J., concurring and dissenting) (stating "homicide . . . is a specific intent crime . . . and the manslaughter offenses are all general intent crimes."). The difference has been described as follows:

> Specific intent has been defined as meaning some intent in addition to the physical act which the crime requires, while general intent means an intent to do the physical act-or, perhaps, recklessly doing the physical act-which the crime requires.

State v. Schouten, 2005 SD 122, ¶13, 707 NW2d 820, 824 (quoting State v. Taecker, 2003 SD 43, ¶25, 661 NW2d 712, 718 (quoting State v. Barrientos, 444 NW2d 374, 376 (SD 1989))). Therefore, to convict Mulligan of manslaughter, there must have been sufficient evidence to find that she intended to fire the gun or that she was reckless with respect to the shooting.

[¶10.] Mulligan points out that there was no evidence that she was reckless in her handling of the gun. Therefore, that method of proving intent is unavailable to sustain the manslaughter conviction. Mulligan then points out that the jury acquitted on the charge of first degree murder, which required proof of intent to kill Goldade. From this acquittal, Mulligan argues that the jury rejected the State's

sole contention at trial - that Mulligan intended to shoot Goldade in order to hide her debt. As Mulligan phrases it in her reply brief, "[w]e know that the jury rejected the notion that [Mulligan] intentionally shot [Goldade], as the jury rejected the murder charge." Based on this assumption, Mulligan claims that she could not be convicted of manslaughter because that crime required intent to commit the physical act of shooting Goldade.

[¶11.] However, Mulligan may not use the jury's rejection of the murder charge to infer that there was insufficient evidence to justify the manslaughter charge. The United States Supreme Court has expressly rejected such reasoning, holding "that a criminal defendant convicted by a jury on one count [can] not attack that conviction because it was inconsistent with the jury's verdict of acquittal on another count." United States v. Powell, 469 US 57, 58, 105 SCt 471, 473, 83 LEd2d 461, 464 (1984) (citing Dunn v. United States, 284 US 390, 52 SCt 189, 76 LEd 356 (1932)). Mulligan, however, points out that the State focused its entire case solely on the charge of murder, and therefore the jury must have rejected the intent to kill element when it acquitted her of murder. However, *Powell* also rejected this argument that examines the focus of the State's case to determine whether the jury necessarily rejected an essential element of a lesser charge. The Supreme Court concluded that even when a case is not "presented to the jury under" the theory that would reconcile the verdicts (in this case manslaughter), a resulting inconsistency may not be utilized to suggest there was insufficient evidence. *See id*. at 61, 105 SCt at 475, 83 LEd2d at 466. In discussing the reason for these holdings, the Supreme Court reiterated Justice Holmes' reasoning in *Dunn* that nothing can be

inferred from an acquittal on one of two interrelated charges because the jury may have disposed of the inconsistent charge through leniency. "'Consistency in the verdict is not necessary'. . . . 'We interpret the acquittal as no more than [the jury's] assumption of a power which they had no right to exercise, but to which they were disposed through lenity.'" *Id*. at 62-63, 105 SCt at 475, 83 LEd2d at 467 (citations omitted). Although some of the *Dunn* Court's analysis is no longer followed, *Powell* reaffirmed *Dunn's* core holding that "where truly inconsistent verdicts have been reached, '[t]he most that can be said . . . is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt.'" *Id*. at 64-65, 105 SCt at 476, 83 LEd2d at 468 (quoting *Dunn,* 284 US at 393, 52 SCt at 190, 76 LEd at 359). Therefore, even though an acquittal may have been rendered on one offense that contains a necessary element of a lesser offense, the lesser conviction will stand because:

> Juries are not held to any rules of logic nor are they required to explain their decisions. The ability to convict or acquit another individual of a crime is a grave responsibility and an awesome power. An element of this power is the jury's capacity for leniency. . . . [T]he mercy-dispensing power of the jury may serve to release a defendant from some of the consequences of his act without absolving him of all responsibility.

People v. Vaughn, 409 Mich 463, 466, 295 NW2d 354, 355 (1980). *See also* People v. Arroyo, 38 AD3d 383, 833 NYS2d 18, 19 (NYApp 2007) (stating that "what may appear to be an irrational verdict may actually constitute a jury's permissible exercise of mercy or leniency").

[¶12.]    These rules are applicable in cases like this where a defendant asserts jury *error* (Mulligan also contends the jury erred in determining that criminal intent was satisfied through negligent conduct, *see infra* ¶18) rather than jury leniency:

> We also reject, as imprudent and unworkable, a rule that would allow criminal defendants to challenge inconsistent verdicts on the ground that in their case the verdict was not the product of lenity, but of some error that worked against them. Such an individualized assessment of the reason for the inconsistency would be based either on pure speculation, or would require inquiries into the jury's deliberations that courts generally will not undertake.

*Powell*, 469 US at 66, 105 SCt at 477, 83 LEd2d at 469. Thus, Mulligan has erroneously assumed that because of the acquittal of murder, the jury found that she did not intentionally fire the gun. Instead of speculating whether the inconsistent verdicts are evidence of jury error, appellate courts should review the sufficiency of the evidence to support the conviction that was rendered. *Id.* at 67, 105 SCt at 478, 83 LEd2d at 470.

> This review should be independent of the jury's determination that evidence on another count was insufficient. The Government must convince the jury with its proof, and must also satisfy the [appellate] courts that given this proof the jury could rationally have reached a verdict of guilty beyond a reasonable doubt.

*Id.*

[¶13.]    Here, the State's physical evidence, independent of the inconsistent verdicts, circumstantially established that the shooting was not accidental. The State also offered substantial circumstantial evidence that Mulligan had reason to intentionally shoot Goldade. Specifically, the evidence showed that: her theft was

about to be disclosed; Goldade would not have reacted well to the disclosure; and she was about to be removed from the home by Goldade.

[¶14.] Mulligan, however, contends that this was evidence of motive and that evidence of motive is not evidence of intent. We agree that motive and criminal intent are not the same in a technical sense. *See* State v. Lassiter, 2005 SD 8, ¶42 n8, 692 NW2d 171, 182-183 (stating that "[m]otive is the 'reason a person chooses to commit a crime,' but it is not equivalent to the 'mental state such as intent' required to commit the crime."). Nevertheless, the same evidence may often prove both motive and intent.

> [T]here is no special evidence of intent . . . apart from evidence of emotion, of knowledge, of design. . . . So if one is charged with wife murder, his ill feelings towards the wife would be an ingredient of criminal intent, and whatever evidence would be otherwise suitable to show motive (i.e., ill feeling) would be receivable also.

2 Wigmore, Evidence §242 (Chadbourn rev. 1979). Therefore, this Court must review the State's evidence of Mulligan's theft, Goldade's impending discovery of the theft, Goldade's intent to remove Mulligan from the home, and the physical evidence to determine whether it, and all favorable inferences that can be drawn therefrom, support the theory that Mulligan acted with intent to shoot Goldade.

[¶15.] The State's evidence included the fact that Goldade was fiscally conservative and did not purchase things on credit. The evidence further suggested that there would have been trouble when Goldade discovered Mulligan was stealing from him. There was also evidence that Mulligan's deception was about to be discovered. The State's forensic accountant testified that Mulligan was only going to realize income of $17,147 per year, while having credit card and debt

management program payments approaching approximately $1,000 per month. Finally, there was evidence that Goldade was going to make Mulligan and her son move out of the home.

[¶16.]     In addition to this evidence of intent, the State's physical evidence tended to establish that the revolver could not have fired accidentally. An expert testified that the revolver would not fire unless the trigger was pulled with significant force. Evidence was presented that the gun could be fired as either a single or double action handgun, and that even in single action mode, it would have taken four to five pounds of pressure to fire. There were also burn marks on the towels that indicated that the gun had been held between the two towels when fired, evidence inconsistent with Mulligan's first version of what occurred.

[¶17.]     Finally, a friend of Goldade's testified that Mulligan's alleged reason for wanting to keep the gun concealed as she approached Goldade was implausible because the three-year-old would have been accustomed to seeing the many guns that were kept in this home. And, with respect to Mulligan's alleged surprise at finding the gun in the closet, there was contrary evidence that Goldade had kept the gun in the closet so that Mulligan would have access to it if she needed it for protection. The evidence also reflected that Goldade and Mulligan had previously discussed needing to move the gun for their son's safety. Thus, the implausibility of Mulligan's story, the physical evidence, and the circumstantial evidence of intent were inconsistent with Mulligan's defense that the gun had accidentally discharged. Instead, that evidence allowed the jury to infer that Mulligan intentionally shot

Goldade to avoid the impending disclosure of her thefts and her removal from the home.

[¶18.]      Mulligan, however, also speculates that the jury incorrectly convicted her, believing that she was merely negligent, a level of mens rea insufficient to constitute intent to commit the act. Mulligan's argument is based on a jury question asking whether "lawful action done without usual and ordinary caution and resulting in a death constitute[s] criminal intent"? However, rather than suggesting that the conviction was erroneously based on a finding of negligence, this question and the trial court's response merely demonstrated that the jury was properly performing its duty to consider whether Mulligan's act was excusable homicide.[2]

[¶19.]      "Homicide is excusable if committed by accident and misfortune in doing any lawful act, with usual and ordinary caution." SDCL 22-16-30. In this case, the trial court correctly instructed the jury on how to distinguish between negligent conduct in an accident under circumstances involving usual and ordinary caution and intentional conduct. In responding to the jury's question, the court incorporated Mulligan's request that the jury be directed to review Instructions 29 and 30 on excusable homicide and specific intent. Instruction 29 reiterated the statutory definition of excusable homicide (accident and misfortune in doing a

---

2.      The jury actually asked a number of questions, all of which suggest the jury was considering whether the shooting was excusable homicide; *i.e.,* committed by accident without usual and ordinary caution, or whether it was intentional conduct.

lawful act, with usual and ordinary caution). Instruction 30 also instructed that Mulligan must have intentionally "[done] the act" of shooting Goldade:

> In the crime of first degree manslaughter the defendant must have criminal intent. To constitute criminal intent it is not necessary that there should exist an intent to violate the law. When a person intentionally does an act which the law declares to be a crime, the person is acting with criminal intent, even though the person may not know that the conduct is unlawful.

[¶20.]    Thus, although the jury obviously had questions concerning this factual dispute, the record reflects that it was performing its required duty to determine whether the shooting was intentional or accidental. Considering the jury's questions and the trial court's response, we do not believe that the jury mistakenly found guilt based upon negligence.

[¶21.]    Mulligan finally argues that the jury was overcome by passion, prejudice, and mistake of law because after rejecting the first degree murder charge, there was no other evidence that would support the manslaughter charge. Although *Powell, supra*, forecloses that argument, Mulligan more specifically argues that the State's evidence of "motive" moved the jury to have sympathy with the victim resulting in a compromise verdict that was unsupported by law or evidence. However, as previously discussed, the evidence of motive was also evidence of intent. Therefore, that circumstantial evidence of intent together with the physical evidence can be used to support a rational theory of guilt. Ultimately, this was a case of credibility and "'the jury is . . . the exclusive judge of the credibility of the witnesses and the weight of the evidence.'" *Pasek*, 2004 SD 132 at ¶7, 691 NW2d at 305 (citation omitted). We therefore affirm this issue.

## 2. Restitution

[¶22.] "It is the policy of this state that restitution shall be made by each violator of the criminal laws to the victims of the violator's criminal activities . . . ." SDCL 23A-28-1. "'Criminal activities,' includes any crime for which there is a plea of guilty or verdict of guilty . . . and any other crime . . . which is admitted by the defendant, whether or not prosecuted." SDCL 23A-28-2.

[¶23.] In this case, Mulligan was ordered to make restitution for the money she stole from Goldade even though she was not convicted of theft and did not admit to the theft. We have found error in similar circumstances. *See State v. Nelson*, 2003 SD 140, 672 NW2d 684 (reversing a restitution order regarding forged checks because the defendant had not been convicted or admitted guilt as to those checks). However, we do not reach the issue in this case because it was waived by Mulligan's failure to object to the State's request for payment of restitution for the theft.

[¶24.] At the sentencing hearing, the State asked for the following restitution:

> [T]hat Ms. Mulligan be required to pay restitution for all costs associated with [Goldade's] medical care subsequent to the shooting, as well as funeral expenses, and any other expenses that were incurred as a result of the injury and/or his death. In addition, the state is asking the Court to impose restitution for the money that Ms. Mulligan stole from [Goldade], pursuant to the events that lead [sic] to his death. . . .

Following this request, defense counsel responded that: "Certainly restitution of all the things mentioned by the state would probably be appropriate." Because the State specifically asked for restitution for the theft, and because Mulligan had the opportunity but did not object to that request, her restitution issue is waived. State

v. Henjum, 1996 SD 7, ¶¶12-14, 542 NW2d 760, 763-764 (holding that issue of restitution was waived when defendant had opportunity but failed to object).

[¶25.]     The dissent argues that plain error review should be applied to this issue, but plain error is inapplicable.  Initially, Mulligan has not requested that we apply plain error in this appeal.  In exercising our appellate function, it is elemental that we should limit our review to the arguments that are raised and briefed.  *See* United States v. Simmons, 964 F2d 763, 777 (8thCir 1992) (stating: "As a general rule, an appellate court may review only the issues specifically raised and argued in an appellant's brief").  By raising and deciding other arguments *sua sponte*, the dissent disregards our appellate function and becomes an advocate for a party.  In fact, the dissent's application of plain error analysis vividly demonstrates why appellate courts do not generally decide arguments not raised by the parties.

[¶26.]     Because we have not had the benefit of briefing on plain error analysis, the dissent applies plain error without recognizing that both this Court and the United States Supreme Court have previously concluded that this type of sentencing error is not subject to plain error review.  It is not applicable because this is not the type of alleged error that seriously affects the fairness, integrity, or public reputation of judicial proceedings.  Under the United States and South Dakota rules:

> Plain error requires (1) error, (2) that is plain, (3) affecting substantial rights; and only then may we exercise our discretion to notice the error if (4) it 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.'

State v. Nelson, 1998 SD 124, ¶8, 587 NW2d 439, 443 (quoting Johnson v. United States, 520 US 461, 466-467, 117 SCt 1544, 1549, 137 LEd2d 718, 727 (1997)).

[¶27.] Under this fourth element, "[w]e invoke our discretion under the plain error rule cautiously and only in 'exceptional circumstances.'" *Id.* (quoting *Henjum*, 1996 SD 7 at ¶14, 542 NW2d at 763). "Such circumstances may include cases in which 'a miscarriage of justice would otherwise result,' *i.e.*, a defendant is actually innocent." *Id.* (quoting United States v. Young, 470 US 1, 15, 105 SCt 1038, 1046, 84 LEd2d 1, 12 (1985)). Or, "[t]he error must . . . have 'so infected the entire trial that the resulting conviction violates due process.'" United States v. Bamberg, 478 F3d 934, 939 (8thCir 2007) (quoting United States v. Smith, 450 F3d 856, 859 (8thCir 2006)). The instant case does not present the types of exceptional circumstances justifying unrequested plain error review. It is, instead, analogous to *Henjum*, where this Court refused to reverse an erroneous restitution order. 1996 SD 7 at ¶14, 542 NW2d at 763.

[¶28.] In *Henjum*, the defendant pleaded guilty pursuant to a plea agreement, but he had not been given any forewarning by the court or counsel of the possibility of the imposition of restitution. *Id.* at ¶12, 542 NW2d at 763. He did, however, have an opportunity to object, but like Mulligan failed to do so at the restitution hearing. *See id.* at ¶13, 542 NW2d at 763. Although Henjum did raise and argue plain error on appeal, this Court held that plain error analysis was not applicable to correct the sentencing error involving restitution. *Id.* at ¶14, 542 NW2d at 763-764. This Court did so even recognizing that improperly imposed restitution "violates a defendant's due process rights under the Fifth and Fourteenth Amendments to the United States Constitution and Article VI, § 2 of the

South Dakota Constitution." *Id.* at ¶13, 542 NW2d at 763 (citations omitted). We concluded: "Even fundamental rights can be waived." *Id.*

[¶29.] The United States Supreme Court, under the analogous federal rule of criminal procedure, also concluded that plain error analysis may not be applied to correct erroneously enhanced sentences. *See United States v. Cotton*, 535 US 625, 122 SCt 1781, 152 LEd2d 860 (2002). In *Cotton*, the defendants' sentences were unconstitutionally enhanced because the facts allowing the enhancement were not included in the indictment as required by *Apprendi v. New Jersey*, 530 US 466, 120 SCt 2348, 147 LEd2d 435 (2000). 535 US at 632, 122 SCt at 1785, 152 LEd2d at 868. The government conceded in *Cotton* that the enhanced sentence was error and "that such error was plain." *Id.* Nevertheless, the Supreme Court concluded that the fourth element requiring that "the error . . . seriously affect the fairness, integrity, or public reputation of judicial proceedings" was not satisfied. *Id.* at 632-633, 122 SCt at 1786, 152 LEd2d at 868. In this unanimous decision reversing a court of appeal's application of plain error, the Supreme Court explained:

> [T]he fairness and integrity of the criminal justice system depends on meting out to those inflicting the greatest harm on society the most severe punishments. The real threat then to the 'fairness, integrity, and public reputation of judicial proceedings' would be if [defendants], despite the overwhelming and uncontroverted evidence that they were involved in a vast drug conspiracy, were to receive a sentence prescribed for those committing less substantial drug offenses because of an error that was never objected to at trial.

*Id.* at 634, 122 SCt at 1787, 152 LEd2d at 869-870.

[¶30.] Like *Cotton*, Mulligan's restitution sentence involved overwhelming and essentially uncontroverted evidence of additional criminal activity (theft). She

never contested her thefts at trial. Instead, in voir dire and throughout the trial, Mulligan's counsel admitted that Mulligan had used Goldade's credit cards and forged his name. And again at sentencing, her counsel admitted that all of the restitution the State requested "would probably be appropriate." Therefore, as the Supreme Court concluded in *Cotton*, in light of the overwhelming and essentially uncontroverted evidence of theft, plain error analysis is inapplicable.

[¶31.] Nevertheless, the dissent believes that its contrary conclusion is also justified by the fact that Goldade's estate could bring a civil action to recover for restitution. *See infra* ¶53. However, the availability of an alternative civil remedy is irrelevant. And, even if the existence of other civil remedies were relevant, we should first review this issue through a competency of counsel claim in habeas corpus. Certainly, Mulligan's counsel had a reason for agreeing that the theft had occurred and that the restitution requested was "probably appropriate." But, it is only through habeas corpus that reviewing courts may receive the necessary evidence from Mulligan's attorney explaining if this trial and sentencing tactic was approved by Mulligan or if there were other reasons for that choice. By focusing on irrelevant civil remedies rather than reasons for agreeing to restitution, the dissent simply declines to even consider why the defense chose to admit the theft at trial and agree to the restitution at sentencing.

[¶32.] Finally, the State did not concede, as the dissent suggests, that remand was necessary in this case. *See id*. The State's brief only indicates that: "*If this issue is not waived*, given this undeveloped record, the case should perhaps be

remanded . . . ." (emphasis added).  The State's main argument is that the restitution issue was waived.  That argument is correct.

### 3. Batson Challenge

[¶33.]     There are three steps in considering a juror challenge under *Batson v. Kentucky*, 476 US 79, 106 SCt 1712, 90 LEd2d 69 (1986).  Generally, "a defendant must first establish a prima facie case of purposeful discrimination by showing he [or she] is a member of a cognizable racial group and the State used its peremptory challenges to remove members of the defendant's race from the potential jury candidates."  State v. Owen, 2007 SD 21, ¶45, 729 NW2d 356, 369 (citing *Batson*, 476 US at 94-95, 106 SCt at 1722).  "[A] criminal defendant may object to race-based exclusions of jurors effected through peremptory challenges whether or not the defendant and the excluded juror share the same race."  Honomichl v. Leapley, 498 NW2d 636, 639 (SD 1993) (citing Powers v. Ohio, 499 US 400, 111 SCt 1364, 113 LEd2d 411 (1991)).  "The burden then shifts to the State to provide a race-neutral explanation for the use of its peremptory challenges."  *Owen*, 2007 SD 21 at ¶45, 729 NW2d at 369 (citation omitted).  "The trial court will then have the duty to determine if the defendant has established purposeful discrimination."  State v. Farmer, 407 NW2d 821, 823 (SD 1987) (citation omitted).

[¶34.]     We review the trial court's ruling under the clearly erroneous standard.  *Batson*, 476 US at 98, n21, 106 SCt at 1724, 90 LEd2d at 89 (stating that "the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility, [therefore] a reviewing court ordinarily should give those findings great deference"); State v. Martin, 2004 SD 82, ¶13, 683 NW2d 399,

403 (utilizing the clearly erroneous standard). *See also* United States v. Crawford, 413 F3d 873, 875 (8thCir 2005) (stating that a "district court's determination that the peremptory challenges are race-neutral is reviewed for clear error").

[¶35.] In this case, the defense established its prima facie case by pointing out that the prosecution struck all five Native American jurors, although the record reflects that the race of the jurors in question may not have been readily discernible. The State then presented its race-neutral reasons for the strikes. In her brief to this Court, Mulligan essentially concedes that there were race neutral reasons for striking two of the five jurors. Therefore, we only consider the State's reasons for striking the three remaining jurors.

[¶36.] The three remaining jurors included one man and two women. The State indicated that it struck the male because it was "seriously worried about his intelligence." The first female was struck because the State felt: 1) she was too young for a murder trial and might be sympathetic to the defendant; 2) during *voir dire*, she had not said anything and had not raised her hand; 3) she appeared to be pregnant, which may have made her sympathetic to the defendant who had a young child; and 4) the State was informed by Officer Jensen that he had recently "picked her up on an intoxicated related situation." The other female juror was struck because she was a younger female who might have been sympathetic to the defendant. The State also indicated that it struck the juror because she "worked at a grocery store, had contact with the defendant, [was] from Timber Lake,[3] [and]

_____

3. Timber Lake was apparently Goldade's hometown.

also [knew] the deceased." The State finally indicated that she had a high school versus a college education, and that "she's had contact with at least some of the local law enforcement."

[¶37.] Although the stated reasons are race neutral on their face, Mulligan argues that the stated reasons for disqualifying the two females were pretextual in light of the fact that three caucasian female jurors with young children were chosen to serve. But at the time the trial court ruled on this issue, the selection process was not complete. Therefore, the trial court ruled that at *that time* "[t]he court can't speculate as to whether or not some of those other young mothers might be gone too." This observation was correct. At the time the defense raised this issue, the State had only used thirteen of its peremptory challenges and the defense had only used twelve. Thereafter, when the jury was selected and a comparison could have been made, the court asked, "[a]nything further from counsel as far as the jury pool?" Defense counsel replied: "Not from the defense." Therefore, either the comparison was no longer valid or the defense chose not to pursue the issue. In either event, if the defense thought that there was an unresolved issue of discrimination in jury selection based upon a comparison of the three female caucasian jurors and the two female Native American jurors, the defense had the burden of raising the issue and establishing a prima facie case. *See Batson*, 476 US at 93-97, 106 SCt at 1721-1723, 90 LEd2d at 85-88. Because Mulligan chose not to raise that issue at the appropriate time at trial, we do not decide it for the first time on appeal. *Henjum*, 1996 SD 7 at ¶13, 542 NW2d at 763.

[¶38.]    The comparison argument also fails to acknowledge that the other reasons stated for striking both females and the male were sufficient to sustain the trial court's finding that there was no pretext.  In addition to the stated reasons involving young women with children, one of the female jurors was struck because she "didn't say a word, didn't raise her hand.  Part of the concern [the State] had was that she didn't raise her hand and [the State] didn't get a feel for the questions that were being asked either by defense counsel or by the [S]tate."  This potential juror had also been "picked up" on an intoxication related offense by a State law enforcement officer who was a witness in this trial.  The other female juror was struck because she had contact with Mulligan through work, she was from the victim's hometown, she may have known the victim, she lacked a college education, and because she also had contact with law enforcement.  The male was struck because the State was "seriously worried about his intelligence."

[¶39.]    Mulligan, however, argues that these facially valid reasons were only "hunches" that do not constitute race-neutral reasons.  However, the Eighth Circuit Court of Appeals recently noted that "'[i]f there is no inherently discriminatory intent in the prosecutor's explanation, the reason offered will be deemed race neutral.'"  United States v. Carter, 481 F3d 601, 609 (8thCir 2007) (quoting United States v. Roebke, 333 F3d 911, 913 (8thCir 2003)).  Here there was no inherently discriminatory intent in any of the State's stated reasons for striking the three jurors.

[¶40.]    Although Mulligan finally argues that the trial court did not perform the third step involving an analysis of pretext, the trial court did so, specifically

finding: "I think the [S]tate has good reasons for all the [peremptory] challenges that they exercised." The court also found "there's a legitimate reason offered for each one that is something other than just a pretext . . . . [A]nd . . . there is no attempt here to purposely exclude Native Americans." Based on all the reasons actually proffered at trial, we see no clear error in these ultimate findings.

### 4. Spoliation Instruction

[¶41.]     Officer Jeff Jensen was one of the first responders on the scene. He testified that he picked up the gun while wearing gloves and emptied the remaining rounds. He put the ammunition in his pocket and then placed the gun on the couch and covered it with a pillow. Later, he had to take the gloves off to remove the ammunition because the latex gloves were sticking to the material in his pocket. Mulligan requested a spoliation instruction concerning possible fingerprint evidence that may have been destroyed when Officer Jensen emptied the gun, placed it under a pillow on the couch[4] and later handled the ammunition without gloves.

[¶42.]     We first observe that the State conceded that Goldade loaded the gun, so any destroyed fingerprint evidence from the ammunition may have only incriminated Mulligan. We also observe that the officer testified that although he was not wearing gloves, he removed the ammunition from his pocket carefully

---

4.     The record reflects nothing more than an unsupported assumption that Jensen may have smudged fingerprints or wiped off anything that might have been on the gun before he touched it. The State noted during the settlement of instructions that there was no proof that there ever was fingerprint evidence that was destroyed. However, the trial court found that the first prong of *Engesser* was satisfied because someone had handled the gun and there was no evidence that this person had been wearing gloves.

attempting to not destroy fingerprint evidence. Nevertheless, Mulligan claims that her fingerprints on the gun may have shown that she was holding the gun in her left hand, which would support her theory of an accidental discharge. Therefore, Mulligan contends that a spoliation instruction should have been given.

[¶43.]    Generally "[a] trial court is not required to instruct on matters that find no support in the evidence[.]" State v. Kafka, 264 NW2d 702, 703 (SD 1978) (citations omitted). The test for giving a spoliation instruction requires substantial evidence of four specific considerations.

> An instruction on the inference that may be drawn from the spoliation of evidence is proper only when substantial evidence exists to support a conclusion that the evidence was in existence, that it was in the possession or under the control of the party against whom the inference may be drawn, that the evidence would have been admissible at trial, and that the party responsible for destroying the evidence did so intentionally and in bad faith.

State v. Engesser, 2003 SD 47, ¶46, 661 NW2d 739, 755.

[¶44.]    Before ruling on Mulligan's proposed spoliation instruction, the trial court considered the requirements of *Engesser*. The only consideration in dispute on appeal is the fourth requirement that there must have been substantial evidence that Officer Jensen destroyed fingerprints intentionally and in bad faith. However, because there was no evidence that the police acted intentionally in bad faith, Mulligan argued that Jensen exhibited a reckless disregard of police procedures for the preservation of evidence, which was manifested through incompetence. Mulligan argued that such reckless and incompetent conduct was equivalent to intentional, bad faith conduct.

[¶45.] Assuming without deciding the validity of Mulligan's "reckless" argument, the trial court found that there was no evidence indicating that Jensen's handling of the gun constituted a reckless disregard of the need to preserve evidence. The trial court's finding was well supported. The evidence reflected that law enforcement appropriately declined to view evidence preservation as the first priority in this case. Jensen testified that as a first responder, he acted to secure the scene out of concern for his own safety and the safety of others. There was also other testimony that this was the correct priority, and that preserving evidence was a third priority behind officer and victim safety. Additionally, although there was testimony that police officers should never assume an innocent shooting (and that Jensen's suspicions were aroused while at the house responding to the 911 call), the 911 dispatcher initially reported that this was an accidental shooting. We have been directed to no other evidence, much less substantial evidence, justifying a spoliation instruction even if reckless conduct were the correct standard. We therefore conclude that the trial court's determination that there was insufficient evidence to give a spoliation instruction was correct.

[¶46.] Affirmed.

[¶47.] GILBERTSON, Chief Justice, and KONENKAMP, and MEIERHENRY, Justices, concur.

[¶48.] SABERS, Justice, dissents.

#24092

SABERS, Justice (dissenting).

[¶49.] I dissent on Issue 2. In my view, it was plain error for the trial court to "impose restitution for the money" defendant allegedly stole from the victim whether objected to or not by trial counsel. The basic requirement is that the defendant either admitted to or was convicted of theft. State v. Nelson, 2003 SD 140, ¶5, 672 NW2d 684, 685 (holding the trial court's decision to order restitution above an amount for which the defendant was convicted or did not admit violated SDCL 23A-28-1); State v. Davis, 458 NW2d 812, 812 (SD 1990) (reversing an order requiring restitution for crimes that the defendant was not convicted of and did not admit); State v. Wolff, 438 NW2d 199, 201-02 (SD 1989) (reversing restitution order of $15,550.40).

[¶50.] SDCL 23A-28-2(4) defines restitution as "full or partial payment of pecuniary damages to a victim . . . ." Pecuniary damages are "all damages which a victim *could recover against the defendant in a civil action arising out of the same facts or event,* except punitive damages and damages for pain, suffering, mental anguish, and loss of consortium." SDCL 23A-28-2(3) (emphasis added). Here, the "facts or event" for which the judge was sentencing was manslaughter. However, the trial court's restitution order required "that defendant reimburse Walworth County for court appointed attorney fees; pay restitution regarding monies *stolen* from the victim; and reimburse all funeral expenses, the cost of the headstone, medical expenses of the victim and other charges related to the death of the victim . . . ." While the attorney fees and "other charges related to the death of the victim" may be recoverable against the defendant in a civil action arising out of the

manslaughter, the restitution for monies stolen arises from separate facts, specifically the alleged thefts. In other words, we require a nexus between the defendant's crime and the victim's damages. *See* State v. Joyce, 2004 SD 73, ¶16, 681 NW2d 468, 471 (holding a defendant who pleaded guilty to failure to provide information due to leaving the scene of an accident could not be ordered to pay restitution for other driver's medical expenses when the failure to provide information did not cause the medical and vehicle expenses). The only crime Mulligan has been convicted of is manslaughter and the manslaughter did not cause the victim to lose the allegedly stolen money.

[¶51.]        In paragraph 27, the majority opinion claims that, "[t]he instant case does not present the types of exceptional circumstances justifying unrequested plain error review." I submit that this is the type of exceptional circumstance that justifies unrequested plain error review. Mulligan has not been charged with, admitted to or convicted of the crime for which restitution was imposed. Therefore, Mulligan is presumed innocent until *proven* guilty. We should not approve a punishment for a person who has not been proven guilty. This error "seriously affects the fairness, integrity, or public reputation of judicial proceedings." State v. Nelson, 1998 SD 124, ¶8, 587 NW2d 439, 443 (quoting Johnson v. United States, 520 US 461, 466-67, 117 SCt 1544, 1549, 137 LEd2d 718 (1997)) (additional citations omitted). The perception of judicial proceedings would be seriously affected if the public knew that a person could be punished for a crime the person had not admitted to, been convicted of or even charged with that crime.

#24092

[¶52.]    Furthermore, the majority opinion cites *Henjum* as support for its conclusion that we should not grant relief in this case. *Supra* ¶27 (citing 1996 SD 7 at ¶14, 542 NW2d at 763). However, *Henjum* is distinguishable because the defendant pleaded guilty to the crime but had not been warned of the possibility of restitution. *See* 1996 SD 7, ¶10, 542 NW2d at 763. Here, Mulligan did not plead guilty to the crime for which restitution was imposed and *Henjum* does not control.

[¶53.]    In this case, Mulligan neither admitted to nor was she convicted of theft in an amount close to the restitution ordered. Even the State's brief suggests "the case should perhaps be remanded for hearing . . . ." The error in ordering restitution in this case is plain error that affects a substantial right. We should reverse on this issue because holding someone liable for a crime that she has not admitted to or been convicted of seriously affects the fairness and reputation of the judicial proceedings against her. *See* State v. Dillion, 2001 SD 97, ¶12, 632 NW2d 37, 43 (noting the plain error rule requires "1) error, 2) that is plain, 3) affecting substantial rights" and 4) we may exercise our discretion if the error "seriously affects the fairness, integrity or public reputation of the judicial proceedings"). The proper remedy in this case is a suit by the estate for damages arising from theft.

[¶54.]    Therefore, we should reverse Issue 2.