#24396-a-JKM

**2008 SD 29**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,                              Plaintiff and Appellee,

   v.

JUDY LYN WILLIAMS,                              Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE JOSEPH NEILES
Judge

\* \* \* \*

LAWRENCE E. LONG
Attorney General

ANN C. MEYER
Assistant Attorney General                    Attorneys for plaintiff
Pierre, South Dakota                          and appellee.

MARK KADI
Office of the Public Advocate                 Attorneys for defendant
Sioux Falls, South Dakota                     and appellant.

\* \* \* \*

CONSIDERED ON BRIEFS
ON NOVEMBER 6, 2007

OPINION FILED **04/09/08**

#24396

MEIERHENRY, Justice

[¶1.] Judy Lyn Williams was convicted of Grand Theft for embezzlement from the Veterans of Foreign Wars Post (VFW) in Brandon, South Dakota. Williams appeals. We affirm.

## FACTS

[¶2.] The State charged Williams with grand theft, claiming she converted VFW funds for her own use. The VFW hired Williams to manage its lounge in 2004. The lounge had a bar and several video lottery machines. As lounge manager, Williams managed the daily operations of the lounge, including accounting for all lounge proceeds, making bank deposits, handling lottery transactions, scheduling employees and taking care of facility rentals. Williams worked during the day, and other employees worked during the evening hours.

[¶3.] The VFW's process of handling the money and accounts involved an on-site safe, a till, three bank bags and two bank accounts. The three bank bags were used to segregate video lottery money from other lounge proceeds. One bank bag was used for video lottery. It contained $7,000 in cash to pay video lottery winnings, customer checks cashed to play the video lottery machines and winning tickets redeemed for cash. A second bank bag contained $1,000 in cash, checks and winning bar pull-tabs. The third bag contained $350 in cash used to make change at the bar. All the bags were kept in a safe located in the back office. Williams and all VFW officers possessed keys to the safe. The safe was left unlocked during hours of operation, but was locked at night. Before closing, the night staff gathered and organized the daily proceeds for Williams' review when she arrived at work the next

-1-

morning. She then segregated the funds from the different sources and deposited them in the proper accounts. Williams then forwarded the daily totals and weekly receipts to Quartermaster Kevin Anderson, who then forwarded the information to the accountant, Ronald Parker, who prepared monthly audits.

[¶4.] The VFW maintained two bank accounts, the "general account" and the "lounge account." The bar, lottery and facility rentals were deposited in the general account. The reimbursement checks for video lottery pay-outs went into the lounge account. Williams deposited money in both accounts, but only had authority to draw checks on the lounge account.

[¶5.] The VFW leased its video lottery machines from Myrmoe Vending Company (Myrmoe Vending). Pam Myrmoe (Myrmoe) owned and operated Myrmoe Vending. Myrmoe Vending reimbursed the VFW for video lottery payouts by check. Part of Williams' responsibilities included depositing Myrmoe Vending payout checks into the lounge account. The VFW also obtained cash advances from Myrmoe Vending to pay video lottery winnings. The cash advances were to go directly into the video lottery bag. Myrmoe would then deduct the amount of the cash advances from the reimbursement/payout checks. Williams was authorized to request and receive the cash advances from Myrmoe Vending, but had no authority to use the advances for any purpose except video lottery payouts.

[¶6.] Myrmoe testified at trial that Williams requested an abnormal number of cash advances during 2004. Myrmoe testified that Myrmoe Vending advanced the VFW approximately $80,000 that year, the majority of which Williams had requested. Myrmoe also testified that because of the unusual amount of activity,

she alerted the VFW Commander Ben Sunvold that "something funny was going on." After an audit, the VFW claimed Williams failed to report one of the cash advances, in the amount of $2,000. Two other advances totaling $3,000 were considered suspicious by the VFW because Williams took them before her vacation without stating a reason and the funds appeared to be missing while she vacationed.

[¶7.] Also during 2004, Williams reported two thefts of VFW cash to the Brandon Police Department – one in May and one in December. Williams reported that she suspected an employee was involved in the May theft. The VFW maintained one surveillance camera for the facility. Sergeant Wade Else of the Brandon Police Department investigated the May theft and reviewed the surveillance video but was unable to identify any criminal activity. In response to the May theft, the VFW installed two additional surveillance cameras near the video lottery machines and the safe.

[¶8.] Sergeant Else also investigated the December theft. This time he had videos from the three surveillance cameras for the twenty-two-hour time frame of the theft. Williams and Sergeant Else reviewed all the videos from the three cameras to try to identify who took the money. Williams was present for all of the viewing. Later when Sergeant Else copied the surveillance videos, he inadvertently deleted a thirty-three-minute segment.

[¶9.] Shortly after the December 2004 theft, Williams quit her job as lounge manager. She took a short vacation and did not return to work. An audit, completed in early 2005, revealed mishandling of VFW finances. The audit showed

#24396

that Williams had deposited checks in the wrong bank account, overstated her deposit slips and video lottery payouts, and received three suspicious cash advances from Myrmoe, one of which went unreported. As a result, the State charged Williams with grand theft, specifically alleging that she had overstated video lottery payouts by $1,700, inflated check deposits by $3,266.44, failed to report a $2,000 cash advance from Myrmoe Vending in October of 2004, and took two suspicious cash advances totaling $3,000 from Myrmoe Vending in August of 2004. Williams admitted to depositing checks into the wrong account. She denied the State's other allegations and claimed that someone else may have taken the missing money from the safe.

[¶10.] A jury found Williams guilty of grand theft in violation of SDCL 22-30A-10 and SDCL 22-30A-17. Williams was sentenced to thirty days in jail, with work release authorized and credit for four days served. The trial court did not order restitution because the evidence indicated that Williams had in all probability redeposited the missing funds during her employment. Williams appeals and raises five issues.

## ANALYSIS AND DECISION

1. Whether the trial court erred by not granting a mistrial because of conversations between a State witness and a jury member and between two sequestered State witnesses.

[¶11.] Williams claims that the trial court should have declared a mistrial because one State witness engaged in improper communications with a juror and two State witnesses had inappropriate communications with each other during the trial. Prior to trial, the court sequestered the witnesses. The court also instructed

-4-

#24396

the jury not to discuss the case or to speak with witnesses when the court was in recess. The trial court charged the jury at the start of trial as follows:

> During the proceeding of the trial, there will be times when you will be outside the courtroom for rest periods and other times when you will be allowed to separate. During all of those times that you are outside the courtroom, you must not talk about this case among yourselves or with anyone else. A violation of this order is serious. . . . Do not talk to the lawyers, defendant, or the witnesses. ***The lawyers, defendant and witnesses are not permitted to talk to you during the trial even in discussions which had no relation to the case would give a bad appearance.*** Should anyone attempt to talk to you about the trial, you should refuse and you should report the attempt to the bailiff or to the judge at first opportunity . . . .

(Emphasis added). Throughout the trial, the court repeated a similar admonition to the jury. Outside the presence of the jury, the trial court cautioned the attorneys and Williams as follows:

> It just occurred to me as we were going through the jury selection process that there's been several jurors that have connections with Brandon, and I know that we may have witnesses who have connections with Brandon, ***I'd encourage both sides, counsel on both sides to re-urge their witnesses to be cautious about not talking to the jurors or speaking to them in any fashion, even if it's about the weather or whatever.*** So that we don't run into problems that we sometimes run into in other cases.

(Emphases added).

[¶12.] Despite the court's admonitions, State witness, VFW Commander Ben Sunvold, had a conversation with a juror during a smoke break about the weather; and State witness, Pam Myrmoe, had a conversation with another State witness, Noelan Letcher. The Myrmoe-Letcher conversation involved a discussion concerning several mutual friends. Williams moved for a mistrial, and the trial court denied the motion.

[¶13.] We review the denying of motions for mistrial under the abuse of discretion standard. State v. Buchhold, 2007 SD 15, ¶17, 727 NW2d 816, 821; State v. Carothers, 2006 SD 100, ¶8, 724 NW2d 610, 615-16. "An abuse of discretion refers to a discretion exercised to an end or purpose not justified by, and clearly against reason and evidence." State v. Beckley, 2007 SD 122, ¶20, 742 NW2d 841, 847.

[¶14.] "Trial court's [sic] have considerable discretion in granting or denying a mistrial and to justify the granting of a mistrial, an actual showing of prejudice must exist." State v. Bousum, 2003 SD 58, ¶31, 663 NW2d 257, 265-66. Prejudice is an error, "which, in all probability, [ ] produced some effect upon the jury's verdict and is harmful to the substantial rights of the party assigning it." State v. Mollman, 2003 SD 150, ¶23, 674 NW2d 22, 29 (citation omitted). However, when improper juror contact "has taken place in a criminal case there arises a rebuttable presumption of prejudice, and the burden is on the state to show the harmless effect of the communication." State v. Swallow, 350 NW2d 606, 610 (SD 1984).

[¶15.] Williams claimed that the Sunvold-juror conversation about the weather bolstered Sunvold's credibility. She claimed that the conversation established a common ground with the juror because both Sunvold and the juror were from the City of Brandon, which was the location of the alleged embezzlement. The State argued that the communication was harmless and had no effect upon the juror's impartiality. The trial court agreed and determined that the brief pleasantry concerning the weather was harmless and caused no prejudice to

Williams. Although the communication was improper, a review of the entire record supports the trial court's ruling on lack of prejudice.

[¶16.] Williams next argued that the Myrmoe-Letcher communication about mutual friends was prejudicial because it was part of a cumulative progression of the State tampering with evidence and the trial process. Williams specifically pointed to the erased segment of the surveillance video and to materials that she claimed should not have been admitted because they were altered and lacked trustworthiness. As to the missing segment of the surveillance video, the trial court determined that (1) Williams presented insufficient evidence that the video contained exculpatory evidence to be prejudicial, and (2) at most, Sergeant Else's deletion of the video segment was "sloppy" not intentional. We agree with the trial court. Williams viewed the entire surveillance video with Sergeant Else, including the subsequently deleted thirty-three minutes when Sergeant Else was investigating the May, 2004 theft. Neither Williams nor Sergeant Else remembered anything of significance on the missing segment that would have exonerated Williams or implicated a third party. Had the missing segment shown a third person stealing money, both Sergeant Else and Williams conceivably would have identified the thief.

[¶17.] The other challenged materials were Myrmoe Vending checks that had white-out and re-written information on the memo line, and other documents used in the audit process that contained notes and markings added by Myrmoe or other people doing the audit. At trial, the relevant witnesses explained when and why they had made the notes and changes. The court found that their explanations

were sufficient to establish trustworthiness for admissibility. Further, the court determined that the Myrmoe-Letcher conversation was not prejudicial since they had not discussed their testimony or anything else concerning the trial. We agree. Williams failed to show prejudice or that the court abused its discretion in denying her motion for a mistrial.

> 2. Whether the trial court erred by allowing two of the State's witnesses to give testimony regarding VFW accounting practices and another witness to testify as a rebuttal witness.

[¶18.] The State presented testimony from VFW Commander Ben Sunvold and past Commander Noelan Letcher about the bookkeeping practices and specific audits of the VFW lounge. Williams claimed that their testimony and opinions lacked proper foundation. Proper foundation requires testimony "that a document has been prepared or kept in the ordinary course of regularly-conducted business activity." Dubray v. Dep't of Soc. Serv., 2004 SD 130, ¶15, 690 NW2d 657, 662-63 (citation omitted); SDCL 19-16-10. "We review a trial court's ruling on the admissibility of evidence under an abuse of discretion standard." State v. Williams, 2006 SD 11, ¶8, 710 NW2d 427, 430.

[¶19.] Letcher testified that he was a long-standing member and past Commander at the VFW, and that he and another member created the bookkeeping system for the VFW. Further, he testified that he conducted weekly "mini-audits" and had been active in the VFW's bookkeeping practices for approximately eight years. Letcher trained Williams for approximately six weeks on the bookkeeping practices, including how to handle the books and conduct a daily accounting. Letcher testified about procedures for deposits and withdrawals from the bank

accounts and the arrangement of obtaining cash advances from Myrmoe Vending. Further, Letcher identified three cash advances that Williams obtained from Myrmoe that, in his opinion, were without sufficient justification.

[¶20.] Sunvold testified that during the period in which the alleged thefts occurred, he was Senior Vice-Commander of the VFW. Sunvold was actively involved in hiring Williams. He and Letcher conducted the October 15, 2004 audit that uncovered some of the alleged wrongdoings by Williams, including the funds deposited in the wrong account and the cash advances from Myrmoe Vending. Sunvold also testified that Myrmoe contacted him in July, 2004, because she believed there was "something funny going on" with respect to the unusually high number of cash advances. Sunvold and Letcher both testified that their audit uncovered that Williams overstated her video lottery payouts by $1,700, inflated her check deposits by $3,266.44, and failed to report or misappropriated $5,000 in cash advances from Myrmoe Vending.

[¶21.] Williams claims that the testimony of Letcher and Sunvold was inadmissible because they were unqualified to testify to the accounting practices at the VFW because neither were accountants. The record, however, indicates that Letcher and Sunvold were sufficiently familiar with the VFW's bookkeeping practices to testify as to its procedures. The State laid the proper foundation for Letcher and Sunvold's testimony regarding the audits they conducted and their findings. Letcher and Sunvold explained to the jury how they conducted the audits and the meaning of the markings they had made on receipts and documents while conducting the audits. Additionally, the evidence showed that Letcher and Sunvold

prepared and kept the records from the audits in the course of regularly conducted VFW business.  *See Dubray*, 2004 SD 130, ¶15, 690 NW2d at 662-63; SDCL 19-16-10.  Williams fails to show that the trial court abused its discretion in allowing the testimony.

[¶22.]        Williams also claims that the trial court improperly admitted rebuttal testimony from Quartermaster Kevin Anderson.  Trial court judges have "wide discretion in permitting the State to introduce additional evidence after it has closed its case."  State v. Stuck, 434 NW2d 43, 54 (SD 1988).  This also applies when the testimony admitted is rebuttal evidence to contradict the defendant's version of the facts.  *Id.*  Williams' testimony raised questions about whether she had done the VFW's books on August 12, 2004, before she left for vacation because "Kevin [Anderson] has writing just like me."  She testified that she could not recall if she had deposited money in the VFW's lounge account or taken any cash advances on the twelfth of August.  The State called Anderson, who testified that he had done the books while Williams was on vacation and had prepared a daily worksheet on August 13, 2004, for the preceding day.  His testimony also rebutted Williams' claim that the alleged missing $3,000 of cash advances was most likely in the safe.  He described how he had opened the safe and accounted for all the funds.  Thus, the court did not abuse its discretion by allowing Anderson to rebut Williams' testimony about the bookkeeping, deposits, cash and cash advances.  *See* State v. Fowler, 1996 SD 78, ¶17, 552 NW2d 92, 95-96; SDCL 23A-24-2(4).

3. Whether the trial court erred in denying Williams' motion to dismiss based on the destruction of evidence.

[¶23.] We review the trial court's denial of a motion to dismiss under an abuse of discretion standard. *Carothers,* 2006 SD 100, ¶8, 724 NW2d at 615-16. The State's duty to preserve the evidence is "limited to evidence that might be expected to play a *significant role* in [a] suspect's defense." Moeller v. Weber, 2004 SD 110, ¶15, 689 NW2d 1, 7 (emphasis in original). The United States Supreme Court in *Brady v. Maryland* set forth the test to determine whether a defendant is entitled to a new trial when the State withholds exculpatory evidence. 373 US 83, 87, 83 SCt 1194, 1196-97, 10 LEd2d 215 (1963). The Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 SCt at 1196-97, 10 LEd2d 215; *see also* Strickler v. Greene, 527 US 263, 280-81, 119 SCt 1936, 1948, 144 LEd2d 286 (1999) (stating "that the duty to disclose [exculpatory] evidence is applicable even though there has been no request by the accused"). This Court has stated that *Brady* violations are analyzed under the three-part test set forth by the United States Supreme Court: (1) whether the evidence at issue was "favorable to the defendant because it is exculpatory or impeaching"; (2) whether the evidence was "suppressed by the State either willfully or inadvertently"; and (3) whether prejudice resulted. State v. Piper, 2006 SD 1, ¶19, 709 NW2d 783, 795 (citations omitted).

[¶24.] Prior to trial, Williams moved to dismiss claiming a due process violation under *Brady.* Williams claimed that the thirty-three minutes of missing

surveillance footage, prepared by Sergeant Else, constituted State suppression of exculpatory evidence, requiring dismissal of the charges. Sergeant Else testified that he did not know why a segment of the video was missing and that the video was supposed to have been copied in its entirety. He further testified that he could not remember what was on the missing segment. Williams argued that the missing segment of the video could have shown another employee removing money from the safe.[1] Part of her defense was that if money was missing, someone else must have taken it. The rest of the surveillance video was in evidence, some of which showed other employees accessing the safe.

[¶25.] Williams also filed a motion for a new trial on the same basis at the conclusion of trial. Under the materiality prong of the *Brady* test, Williams had to show that "there [was] a reasonable probability that [the] conviction or sentence would have been different had these materials been disclosed." Strickler v. Greene, 527 US 263, 296, 119 SCt 1936, 1955, 144 LEd2d 286 (1999). In *State v. Leisinger*, we held that in order for suppressed evidence to require a new trial, the defendant must demonstrate that the evidence was favorable or helpful to the defense and that prejudice resulted from its suppression. 2003 SD 118, ¶14, 670 NW2d 371, 375 (citation omitted). Williams, who had personally viewed the missing segment before it was erased, did not establish that the erased thirty-three-minute segment contained exculpatory evidence. Thus, Williams failed to establish there was a reasonable probability she would not have been convicted had the missing video

---

1.    Another employee pleaded guilty to theft from the VFW women's auxiliary at the same time these allegations arose. The other employee denied all involvement with any alleged theft from the Brandon VFW.

#24396

been available. The trial court did not abuse its discretion in denying Williams'
motions to dismiss.

> 4. Whether the trial court erred in denying Williams' motion for judgment of acquittal based on insufficiency of the evidence.

[¶26.] Williams was convicted of violations of SDCL 22-30A-10 and SDCL 22-
30A-17. SDCL 22-30A-10 provides the elements of embezzlement of property
received in trust:

> Any person, who has been entrusted with the property of another and who, with intent to defraud, appropriates such property to a use or purpose not in the due and lawful execution of his or her trust, is guilty of theft. A distinct act of taking is not necessary to constitute theft pursuant to this section.

At the time of the offense, SDCL 22-30A-17 defined grand theft as theft of property
exceeding $500 in value.[2] Williams argues the State failed to present evidence that
she "appropriated money to a use or purpose not in the due course of lawful
execution of her trust" with a value greater than $500. SDCL 22-30A-10. She
alleges that the trial court erred by denying her motion for acquittal. Specifically,
Williams argues the State failed to provide evidence of the nature of the alleged
trust, the requisite intent to appropriate funds, the conversion of funds to Williams'
own use and the total amount of money taken, as evidenced by the court's inability
to order restitution.

---

2. Effective July 1, 2006, SDCL 22-30A-17 was amended to increase the amount required for grand theft from $500.00 to $1000.00. At the time of the commission of the offense the statute provided as follows: "Theft is grand theft, if: (1) The value of the property stolen exceeds five hundred dollars; . . . Theft in all other cases is petty theft."

-13-

[¶27.] We analyze the sufficiency of the evidence by determining whether there is evidence in the record, which if believed by the jury, "is sufficient to sustain a finding of guilt beyond a reasonable doubt." State v. Mulligan, 2007 SD 67, ¶7, 736 NW2d 808, 812-13. The jury is "the exclusive judge of the credibility of the witnesses and the weight of the evidence." *Id.* A jury verdict will only be set aside if "the evidence presented, including the favorable inferences drawn therefrom," does not provide "a rational theory that supports the jury's verdict." State v. Motzko, 2006 SD 13, ¶13, 710 NW2d 433, 439.

[¶28.] Although the State's evidence is not overwhelming, a review of the evidence and the favorable inferences drawn therefrom indicates sufficient evidence to sustain the verdict. Clearly the VFW entrusted Williams to handle and account for all the cash taken in and paid out while she served as manager. She was allowed to receive cash advances from Myrmoe Vending when video lottery payouts approached $7,000 in order to have enough cash on hand to cover future video lottery payouts for one week, Thursday to Wednesday. She was entrusted to settle accounts with Myrmoe each Thursday, including commission for the use of the machines, video lottery payouts and repayment for any cash advances taken the previous week. Her duties also included accounting for and depositing of proceeds into the VFW bank accounts. She had authority to withdraw funds from the lounge account but not the general account. The State's evidence, if believed by the jury, sufficiently established the requisite entrustment with VFW property pursuant to SDCL 22-30A-10.

[¶29.] The State also presented sufficient evidence that Williams converted funds for her own use. Some of the conversion claim derived from the excessive cash advances Williams requested from Myrmoe Vending. Williams requested several cash advances in 2004, totaling more than the amount of video lottery payouts and causing a negative account balance with Myrmoe Vending. The October 15, 2004 audit, prompted by Myrmoe's concerns about the excessive number of Williams' cash advances, revealed that Williams received but failed to account for two cash advances from Myrmoe Vending totaling $3,000. The day before the audit, Williams had filled out a deposit ticket for the lounge account in the amount of $648.25. The Bank's records showed that Williams actually deposited $2,648.25 and then wrote a check for cash in the amount of $2,648.25. The State's theory was that Williams used the $2,000 to replenish the lottery bag for money she had previously taken.

[¶30.] Additionally, the State presented evidence that Williams altered her daily bookkeeping worksheets by increasing the amount actually paid out in video lottery winnings and by improperly depositing general account funds into the lounge account and immediately withdrawing the same. The daily worksheets for the six video lottery machines showed overstated payouts in increments of $1,000, $2,000 or $3,000. Williams then deducted these overstated payouts noting the correct payouts on the final worksheet for the week. There was also evidence of improper deposits into the lounge account – the account on which Williams could write checks. The deposits included checks from commissions and rentals that belonged in the general account -- the account on which Williams could not write

checks. The evidence revealed that Williams made the improper deposits then wrote checks and received cash.

[¶31.] Williams claimed the deposits in the wrong accounts were merely mistakes and did not prove that she intended to embezzle. The requisite intent for grand theft embezzlement pursuant to SDCL 22-30A-10 is the "intent to defraud." SDCL 22-30A-10; State v. DeWall, 343 NW2d 790, 791-92 (SD 1984). Intent is defined in SDCL 22-1-2(1)(b) as "a specific design to cause a certain result . . . ." To prove intent, the State presented evidence that shortly before Williams went on vacation she received $3,000 in cash advances from Myrmoe Vending that she failed to put into the video lottery bag and misrepresented another $2,000 cash advance. The State also established her intent by her overstated video lottery payouts on her daily records and her erroneous deposit of funds into the account on which she was authorized to write checks for cash. If believed by the jury, the State's evidence, along with favorable inferences therefrom, was sufficient to establish intent to defraud.

[¶32.] Although the State did not present direct evidence on how she used the converted funds, the evidence was sufficient for the jury to conclude that she converted it for her own use. The evidence showed that she was in sole possession of the VFW funds for periods of time without authorization. The audits revealed that Williams deposited funds into the wrong bank account, and improperly accounted for and withdrew these unauthorized funds for no legitimate business purpose. Furthermore, Myrmoe testified regarding the excessive number and amount of cash advances during Williams' tenure as lounge manager. The

inference is that Williams took the funds for her own use for a period of time even though she may have ultimately replaced the funds. This circumstantial evidence, if believed by a reasonable jury, was sufficient under our standard of review to establish that Williams converted the funds, at least temporarily, for her own use. *See Mulligan,* 2007 SD 67, ¶7, 736 NW2d at 812-13; *see also* State v. Shaw, 2005 SD 105, ¶45, 705 NW2d 620, 633 ("All elements of a crime, including intent . . ., may be established circumstantially.") (citations omitted).

[¶33.]     Finally, Williams argues that the State failed to establish that the value of the stolen property exceeded $500. Hundreds of receipts and financial report documents showing the misappropriation of funds were presented at trial. The documents indicated that during periods in 2004, money in excess of $500 was misappropriated/missing. Testimony of overstated video lottery payouts of $1,700, Williams' inflated check deposits by $3,266.44, and unreported or misrepresented cash advances from Myrmoe Vending of $5,000 established a value over $500. Based on all the evidence, the trial court did not err in denying Williams' motion for judgment of acquittal.

> 5.     Whether the trial court erred in failing to instruct the jury on the lesser-included offense of petty theft.

[¶34.]     Williams argues the court erred in refusing her proposed lesser-included-offense instruction for petty theft. "A lesser-included-offense instruction should be given when (1) the elements test is met and (2) some evidence in support of such instructions exists in the record." State v. Giroux, 2004 SD 24, ¶5, 676 NW2d 139, 141 (quoting State v. Hoadley, 2002 SD 109, ¶64, 651 NW2d 249, 264). "If evidence has been presented which would support a conviction of a lesser charge,

refusal to give the requested instruction would be reversible error." State v. Heumiller, 317 NW2d 126, 132 (SD 1982) (citation omitted). We apply de novo standard of review to the refusal of proposed lesser-included instruction. *Giroux,* 2004 SD 24, ¶4, 676 NW2d at 140-41.

[¶35.]    There is no dispute that under the elements test, petty theft is a lesser-included offense of grand theft. The issue here is whether there was some evidence in support of a petty theft instruction. To justify the lesser-included instruction, Williams must proffer some evidence that would tend to support the lesser charge. As this Court stated in *Giroux*, "[t]he defendant is only required to present some evidence for the lesser included offense to be presented to the jury." 2004 SD 24, ¶16, 676 NW2d at 145. We review the factual evidence "in the light most favorable to the defendant, which would justify a jury in concluding that the greater offense was not committed and that a lesser offense was, in fact, committed." State v. Wall, 481 NW2d 259, 264 (SD 1992) (citations omitted).

[¶36.]    The State's evidence was that Williams overstated lottery payouts by $1,700, inflated check deposits by $3,266.44, failed to report a $2,000 cash advance from Myrmoe Vending, and received another $3,000 in cash advances allegedly for her personal use. Any one of these was sufficient to establish the monetary requirement of grand theft. Based on the evidence, the trial court concluded that the jury could only find guilt of grand theft or acquit. Williams' only argument for a petty theft instruction is based on her own testimony that she once made a mistake and incorrectly rang up a $100 instead of $1.00 for the cigarette lighter. However, her claimed error in ringing up an incorrect charge did not figure in any of the

State's allegations of theft. Williams did not testify she converted these funds to her own use or misappropriated them in anyway; she merely testified that one potential discrepancy in the audits could have been due to her mistake. The trial court concluded that the evidentiary requirements for a lesser-included instruction were not met. We agree. The record is devoid of evidence that would support the lesser charge of petty theft.

[¶37.]     We affirm on all issues.

[¶38.]     GILBERTSON, Chief Justice, and SABERS, KONENKAMP, and ZINTER, Justices, concur.